CONNELLSVILLE CENTRAL COKE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 21798, 24226.   Promulgated February 20, 1933.

*Thomas Watson, Esq.,* and *D. G. Sisterson, C. P. A.,* for the petitioner.

*James L. Backstrom, Esq.,* and *P. A. Sebastian, Esq.,* for the respondent.

MURDOCK: The first question is to determine how the profits taxes due for the years 1917, 1918 and 1920 should be computed. Section 210 of the Revenue Act of 1917 provides that if the Secretary of the Treasury is unable in any case to determine satisfactorily the invested capital, a deduction shall be computed by a certain comparison with other representative taxpayers engaged in a like or similar trade or business. Section 327 (a) of the Revenue Act of 1918 provides that the tax shall be determined as provided in section 328 where the Commissioner is unable to determine the invested capital as provided in section 326. These particular provisions of the two acts need not be discussed separately. Cf. *United States* v. *Factors & Finance Co.*, 288 U. S. 89. The Commissioner has determined an amount to represent the petitioner's invested capital for each year. The petitioner claims, however, that its invested capital can not be determined satisfactorily. If this contention is correct we need not consider whether there are any abnormal conditions within the meaning of section 327 (d).

It is fair to assume, from the record before us, that the petitioner has some earned surplus. If the amount of that surplus can be satisfactorily determined, it must be included in invested capital. The theory of the petitioner's case must be that it has capital assets not shown on its books as such; the cost of these can not be determined at this time; and, as a consequence, its invested capital can not be determined since a part of the cost of these assets should be reflected in a correspondingly larger surplus than its books now show. The alleged assets are entries or tunnels in the Herbert mine which were intended and equipped for further use in extracting other coal. Coal was produced in driving these entries, but another important purpose in driving them was to provide the mine with a system for the future. They were constructed and equipped in the early years of the mine, yet the system, once developed, had an effect on all of the remaining coal in the mine. Certain of these entries existed at the beginning of the fiscal year 1917 and were actually used during the three years 1917, 1918 and 1920 in earning the income now being taxed. The petitioner claims that the cost of the part of this system which remained in use was substantial. No amount of diligence would disclose the actual cost. Cf. *Edwin M. Knowles China Co.*, 9 B. T. A. 1292. It attempted to show the approximate cost. The respondent strenuously attacks the testimony of a witness on this subject, but the case does not stand or fall on his testimony. There is other evidence of the approximate cost and we are satisfied from the whole record that the cost was substantial.

The respondent concedes that the driving and equipping of these entries was development work. In most cases he requires, in accordance with good accounting practices, that the cost of assets having a useful life beyond the year in which acquired be capitalized so that income may be clearly reflected. Yet he has refused to permit the capitalization of any part of the cost of these entries and the equipment in them. As a reason in the case of mines for an exception to a general rule, he points to the fact that the entries were dug through solid coal and contends that the coal thus produced more than compensated the petitioner for the cost of digging it. He would apply a portion of article 222 (a) of Regulations 45, as amended on January 28, 1921, to the effect that, while a mine is in the development stage, there shall be charged to capital account only those expenditures for development in excess of receipts from minerals sold. The article in its original form and as amended is set forth in the margin.[1] Regulations 45 relate to the Revenue Act of 1918. The year 1917, here involved, is not affected by the Revenue Act of 1918. But the amended regulation probably relates back to the years 1918 and 1920, even though it was not promulgated until afterward.

The respondent contends that the Herbert mine was in the " development stage " until 1915 and that a profit was made during this period by the petitioner from the sale of minerals. On his theory there were no expenditures for development in excess of receipts from minerals sold in the case of the Herbert mine, and, consequently, nothing to be charged to capital account recoverable through depletion. The regulation introduces the phrase " receipts from minerals sold ". The petitioner sold only a negligible amount of coal, and if the regulation were to be construed strictly, practically all of

---

[1] [Article 222, Regulations 45, as originally promulgated.] In the case of mining operations all expenditures for plant equipment, development, rent, and royalty prior to production, and thereafter all major items of plant and equipment, shall be charged to capital account for purposes of depletion and depreciation. After a mine has been developed and equipped to its normal and regular output capacity, however, the cost of additional minor items of equipment and plant, including mules, motors, mine cars, trackage, cables, trolley wire, fans, small tools, etc., necessary to maintain the normal output because of increased length of haul or depth of working consequent on the extraction of mineral, and the cost of replacements of these and similar minor items of worn-out and discarded plant and equipment, may be charged to current expense of operations.

[Article 222, Regulations 45, as amended January 28, 1921.] (a) All expenditures for development, rent, and royalty in excess of receipts from minerals sold, shall be charged to capital account recoverable through depletion, while the mine is in the development stage. Thereafter any development which adds value to the mineral deposit beyond the current year shall be carried as a deferred charge and apportioned and deducted as operating expense in the years to which it is applicable.

(b) All expenditures for plant and equipment shall be charged to capital account recoverable through depreciation, while the mine is in the development stage. Thereafter the cost of major items of plant and equipment shall be capitalized but the cost of minor items of equipment and plant, necessary to maintain the normal output, and the cost of replacement may be charged to current expense of operation.

the development costs would be capitalized. Even under a liberal construction and assuming the validity of the regulation since the petitioner manufactured its coal into coke the cost and receipts allocable to the manufacturing process should be eliminated in order to determine how much should be charged to capital account.

The entries in question, when once they had been developed and equipped, added value to the mineral deposit beyond the current year. The regulation itself provides, where such development takes place after the " development stage " is over, that the cost shall be carried as a " deferred charge " and deducted over later years. The quoted words do not occur in the statute. We do not know what significance the respondent attaches to the words " deferred charges ". Perhaps he would allow such expenditures to be capitalized. Cf. Regulations 65, article 224 (a). He recognizes that the " development stage " need not continue until all development work is done. For various definitions of " development stage " see the corresponding articles of later regulations and also *Marsh Fork Coal Co.* v. *Lucas*, 42 Fed. (2d) 83, 86; *Little Cahaba Coal Co.* v. *United States*, 15 Fed. (2d) 863. The latter case was reversed in *Blockton Cahaba Coal Co.* v. *United States*, 24 Fed. (2d) 180. It is obvious from the testimony in this case that the Herbert mine did not continue in the " development stage ", as we would interpret the words, until 1915. The petitioner maintains that it passed out of the " development stage " on or about November 1, 1909, and that the net result of the entire operation of the Herbert plant up to that date was a loss. We need determine no exact date in this connection. The mine was designed to supply the ovens with coke. It was fulfilling this purpose long before 1915, and at an early date it had sufficient entries developed for this purpose.

However, the question at once arises as to whether or not the portion of article 222 relied upon by the Commissioner is a reasonable regulation or a proper one to apply in this case. The respondent has neither cited authority nor advanced any sound argument in support of this provision of his regulations. None occurs to us. Although there may be a practical difficulty in dividing the cost of producing coal from the cost of development, yet this difficulty need not deter us, since other portions of the regulation require such a division. The Circuit Court of Appeals for the Fifth Circuit has held, in *Blockton Cahaba Coal Co.*, *supra*, that the cost of development in a coal mine should be capitalized regardless of whether or not a profit is made during the development period. In that case the development in question was the driving of a main entry into the coal from an outcrop. The case is not distinguishable

from the present case. It sets at naught the very provision of the regulation which the Commissioner now relies upon.

The Revenue Act of 1913 permits as a deduction from income " a reasonable allowance for the exhaustion, wear and tear of property arising out of its use or employment in the business, not to exceed, in the case of mines, 5 per centum of the gross value at the mine of the output for the year for which the computation is made * * * provided, that no deduction shall be allowed for any amount paid out for new buildings, permanent improvements or betterments made to increase the value of any property or estate." The Revenue Acts of 1916 and 1918 contain similar provisions but omit the 5 per centum limitation. The latter act contains also section 234 (a) (9), which allows as a deduction:

In the case of mines * * * a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted.

Through the expenditures incurred in driving and equipping these entries, the petitioner acquired facilities, including haulage ways, ventilation and drainage, which were necessary for and were actually used in the mining of the remaining coal. They not only decreased the cost of producing the remaining coal in the mine, but the evidence also indicates that they actually added value to the mine after due allowance is made for the coal extracted. The driving of an entry is a more expensive proposition than the mining of an equivalent quantity of coal from portions of the mine which are not to be used as entries. The petitioner actually found this to be true. Therefore, it seems only proper that not all of the cost of driving and equipping these entries should be charged as an ordinary and necessary expense in producing only that coal recovered from these entries. So that the remaining coal may bear its proper share of this cost, some part of the cost should be capitalized. Here we need not determine what part, for we are convinced that a substantial amount should be capitalized and that a substantial part of this cost remained during the taxable years in question after proper allowances for exhaustion. The statutes require that the cost of development be recovered upon a reasonable basis so that income may be clearly reflected. Good accounting requires that part of the cost be capitalized if income is to be clearly reflected. Under the statutes the petitioner was entitled to have a substantially larger amount of invested capital than the respondent has allowed or it is able to establish. Its invested capital can not be determined.

We have held that the petitioner should have capitalized certain amounts which it deducted as expenses. Anticipating the possibility of such a holding, the respondent contends that under that

view of the case he erred in allowing deductions of $1,250 and $16,125 in computing the petitioner's net income for 1917 and 1920, respectively. These amounts he contends represent the cost of entries constructed in those years. However, the record does not show in regard to these years what deductions the Commissioner has allowed representing cost of driving entries, the amount expended by the petitioner in driving entries, nor the nature or character of the entries actually driven. Consequently, we hold for the petitioner on this point.

The remaining issue is raised by the petitioner's assignment of error to the effect that the Commissioner failed to allow a deduction of $65,560.53 which amount was authorized during the year 1920 " and either paid or credited during the year 1920 as compensation to officers for services rendered in prior years ". Section 234 (a) (1) of the Revenue Act of 1918 allows as a deduction " all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for services actually rendered ". Additional compensation authorized to be paid for services rendered in prior years may be deducted under this provision in the year in which paid or incurred, provided that it is a reasonable allowance for the services rendered. *Ox Fibre Brush Co.*, 8 B. T. A. 422; affd., 281 U. S. 115. Distributions of profits made to stockholders in the guise of salaries are not deductible. *New York Theatre Program Corp.*, 4 B. T. A. 431; *Twin City Tile & Marble Co.*, 6 B. T. A. 1238; affd., 32 Fed. (2d) 229; *Am-Plus Storage Battery Co.*, 11 B. T. A. 733; affd., 35 Fed. (2d) 167; *Marble & Shattuck Chair Co.*, 13 B. T. A. 657; affd., 39 Fed. (2d) 393; *General Water Heater Co.*, 14 B. T. A. 4; affd., 42 Fed. (2d) 419; *Mendelson Brothers Paper Stock Co.*, 17 B. T. A. 53; affd., 44 Fed. (2d) 372.

In its original return for 1920 the petitioner claimed a deduction of $18,963.26 as compensation of officers. The respondent has allowed this deduction. The petitioner has not shown what items go to make up this total nor who received the compensation. Fifty-seven thousand dollars was shown on the original return as an unallowable deduction representing special bonuses to officers. But on the amended return $84,523.79 was claimed as a deduction representing compensation of officers. Thus the petitioner increased its claim by $65,560.53. The Commissioner has allowed no part of this increase. The $65,560.53 represents $57,000 paid in the early part of December 1920, and $8,560.53 paid a little more than six months

later. Apparently the additional amounts were paid in 1921 because the resolution of November 28, 1920, provided that the bonus be " free from all taxes ". We are unable to say, however, that the $8,560.53 was either paid or incurred in 1920 and for this reason, if for no other, this amount should not be allowed as a deduction for 1920.

The petitioner claims the right to deduct the additional amount in controversy as compensation of officers, yet the record does not show that either Brennan or Hillman ever held any office in the corporation. They were directors but, so far as we know, they were not officers. However, the four individuals in some capacity or another rendered some valuable services to the corporation. But prior to 1920 each one of these individuals had been amply compensated for all services which he had rendered the corporation up to that time. They had received a total of $455,000 in prior years as directors' salaries. Neff had received, in addition, his regular salary. The directors' salaries were in direct proportion to stockholdings. Counsel for the petitioner did not learn until after the hearing that these directors' salaries had been paid. They now contend in a reply brief that these amounts were really a distribution of profits and not compensation for personal services rendered. But the extra compensation authorized in 1920 was also in direct proportion to stockholdings rather than in proportion to the value of services rendered by the four and it came nine years after Hillman's death. There is more reason to hold that the four individuals were compensated in full for their services by the amounts paid them in the earlier years than there is to hold that the authorization in 1920 was a belated recognition of services rendered in years long past. The petitioner was well able to pay any amount which it owed to its officers and directors prior to 1920 and the amounts paid over that period to these individuals amply compensated them for all services rendered up to 1920. In our opinion the amount authorized in 1920 was not a reasonable allowance for salaries or other compensation for services actually rendered. Rather, it was a distribution of profits in the guise of compensation.

DuPuy was paid a salary of $3,000 in 1920, but the record is not clear as to the total compensation received by Neff for that year. We have no reason to believe that the Commissioner has not already allowed as a deduction the $3,000 paid to DuPuy, and whatever amount was paid to Neff. Both Brennan and Neff died in 1920. Hillman had been dead for nine years. There is some evidence to indicate that Neff had been ill and unable to perform any services

for the petitioner for a year or more prior to his death. We are unable to say that the amount allowed by the Commissioner was any less than a reasonable allowance for all salaries and other compensation for services rendered. Certain returns of other companies which were offered in evidence indicate that the allowance made by the Commissioner was adequate.

*Decision will be entered under Rule 62 (c).*