Transportation Service Associates, Inc. v. Commissioner.
Transportation Serv. Assocs. v. Commissioner
Docket No. 110653.
United States Tax Court
1944 Tax Ct. Memo LEXIS 372; 3 T.C.M. (CCH) 135; T.C.M. (RIA) 44036; February 11, 1944
*372 James L. Moore, Esq., for the petitioner. Jonas M. Smith, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This proceeding involves income taxes, excess-profits taxes and personal holding company surtaxes for the taxable years ended November 30, 1937, 1938 and 1939; income tax, declared value excess-profits tax and personal holding company surtax for the taxable year ended November 30, 1940; and penalties for the taxable years ended November 30, 1937 and 1938. The amounts of the deficiencies and penalties as determined by respondent are set forth in the following table: Personal
Year
Excess
Declared
Holding
ended No-
Income
Profits
Value Excess
Company
vember 30
Tax
Tax
Profits Tax
Surtax
Penalties
1937
$4,283.03
$1,741.36
$ 2,258.74
$564.69
1938
309.87
1.34
1,391.73
347.93
1939
457.33
92.21
2,543.99
1940
2,038.45
$569.23
10,965.48
Totals
$7,088.68
$1,834.91
$569.23
$17,159.94
$912.62
By amended answer respondent affirmatively alleged (1) that petitioner's gross income for the taxable year ended November 30, 1937, as previously adjusted, should be increased by $30 to remove an error *373 apparent in the recomputation and (2) that the petitioner's gross income for the taxable year ended November 30, 1940, as previously adjusted, should be increased by $7,200, the amount of the deduction which he alleges was erroneously allowed for salaries paid to petitioner's officers-directors. He asks that the deficiencies for the designated years be increased in accordance with these affirmative allegations and that effect be given thereto in our redetermination. The questions here presented may be stated as follows: (1) Did the retirement of the Winona Railroad Company's gold notes result in taxable gains to petitioner in the taxable years ended November 30, 1937 and 1938? (2) If so, are the deficiencies for the taxable year ended November 30, 1937, barred by the statute of limitations? (3) Is petitioner entitled to a $3,989.66 deduction for the taxable year ended November 30, 1939 for interest paid? (4) Is petitioner entitled to a $11,890.13 deducation in the taxable year ended November 30, 1940 for interest paid? (5) Is petitioner entitled to a $3,000 deduction in the taxable year ended November 30, 1940, for compensation for services paid T.C. Frazer? (6) Is petitioner entitled *374 to a $7,200 deduction in the taxable year ended November 30, 1940, for salaries paid its officers-directors? (7) If any or all of the last three questions are answered in the negative, is petitioner, in computing its personal holding company surtax for the taxable year ended November 30, 1940, entitled to a dividends paid credit in the amount of its undistributed subchapter A net income by reason of a distribution of its assets in liquidation? All returns filed were filed on a cash receipts and disbursements basis with the collector of internal revenue for the fifth district of New Jersey. No personal holding company returns were filed for the years ended November 30, 1937 and 1938. The proceeding was submitted upon a stipulation of facts, oral and documentary evidence. The stipulation shall be considered a part of our findings of fact but we set forth only so much thereof, together with other material facts established by the evidence, as we deem necessary to an understanding and determination of the issue. Findings of Fact Petitioner was a Delaware corporation having its principal office at the home of its secretary-treasurer in Hohokus, New Jersey. It was formed in November *375 1934 and was dissolved, under statutory authority, December 27, 1940. Its sole assets consisted of the securities of and stock in the Winona Railroad Company, hereinafter sometimes called Winona, which were acquired and distributed under circumstances hereinafter stated. Until February 1940 petitioner's stock was owned equally by Harry Reid, Lee P. Stark, Harry H. Dartt, Edward C. Isele, and their respective wives. Each family initially subscribed to two shares of stock at $125 per share and purchased 40 additional shares at the same share price in November 1935. T. C. Frazer and wife purchased 42 shares in February 1940. Petitioner's paid-in capital was $1,000 from its inception to November 1935, $21,000 until February 1940 and $25,200 thereafter, $1,050 of the amount of $5,250 received from the Frazers for capital stock having been applied to paid-in surplus. From the date of such stock purchase by Frazer and wife in February 1940, the amount of the outstanding capital stock of petitioner at all times during the remainder of that taxable year was 210 shares of common stock, owned as follows: 42 shares by A. and T. C. Frazer, and 21 shares each by L. P. Stark, E. Stark, H. Dartt, *376 E. Dartt, H. Reid, L. V. Reid, E. C. Isele, and K. A. Isele. Reid, Stark, Dartt and Isele were at all times petitioner's officers and directors. Their interest in petitioner was purely one of investment. Reid was an executive of The New York State Electric & Gas Corporation until the summer of 1940 when he organized his own company in Indianapolis, Indiana; Dartt was fully occupied as president of the Scranton Transit Co., Stark was a practicing attorney in Scranton, Pa., and Isele was a full time employee of the Atlantic Utility Company. They held directors' meetings on an average of once a month and corresponded during the interims relative to the affairs of petitioner. Stark handled petitioner's legal matters and Isele kept its books and prepared the tax returns. Winona was in receivership from June 1932 to July 1936. T. C. Frazer was receiver for the period of its receivership and was thereafter its president. Winona is a 62 mile railroad running north and south in Indiana and crossing or connecting with several large railway systems. Winona had issued and outstanding 9,996.61 shares of capital stock, $800,000 face value of first mortgage 6 per cent gold bonds and $22,000 face *377 value of gold notes. On and prior to September 28, 1934, Martin J. Insull and Harry Reid owned all of such capital stock and gold bonds and Harry Reid owned all of the gold notes. On September 28, 1934, two contracts were made involving the sale of these interests to Dartt and Stark. The vendors in one contract were Insull and Reid and the instrument contained the following pertinent language: "FIRST: The Vendors hereby sell and transfer unto the Purchasers, the following securities of The Winona Railroad Company, to wit: $800,000 principal amount of First Mortgage 6% Gold Bonds, Series A 9,996.61 shares of common stock "SECOND: The Purchasers shall pay to The Chase National Bank of the City of New York, on the execution hereof, the sum of Five Thousand dollars ($5,000). "THIRD: The Purchasers shall pay to The Chase National Bank of the City of New York, its successors or assigns, the further sum of Ninety-five thousand dollars ($95,000), payable in installments of Twenty-five hundred dollars ($2,500) per month. Interest at the rate of six per cent (6%) per annum shall be paid monthly on the unpaid balance of the purchase price. Payment of principal and interest shall be made *378 on or before the 28th day of each month * * * "FOURTH: The Purchasers shall have the right to anticipate payments on the said principal sum. "FIFTH: All of the securities purchased hereunder shall remain in the possession of The Chase National Bank of the City of New York, until the total sum of $100,000 together with interest thereon shall be paid in full to the said bank." Reid was the sole vendor in the other agreement which, so far as material here, is as follows: "WHEREAS, Harry Reid, the Vendor, owns $22,000 principal amount of 6% Gold Notes of The Winona Railroad Company; and "WHEREAS, the Purchasers have this day also entered into a contract with Martin J. Insull and Harry Reid for the purchase of certain bonds and stock of The Winona Railroad Company; "NOW, THEREFORE, in consideration of One Dollar ( $1) each to the others paid, the receipt whereof is hereby acknowledged, the parties agree as follows: "FIRST: The Vendor hereby sells and transfers unto the Purchasers the following securities of The Winona Railroad Company, to wit: "$22,000 principal amount of [sic] 6% Gold Notes upon the following terms and conditions: "(1) Delivery of said notes shall be made to *379 Purchasers simultaneously with the release by The Chase National Bank of the City of New York of the bonds and stock purchased by Purchasers from Martin J. Insull and Harry Reid under the aforementioned contract. "(2) As a consideration for said notes, Purchasers agree to transfer and deliver to Vendor a 10% interest in The Winona Railroad Company acquired by them under said contract with Martin J. Insull and Harry Reid, subject, however, to said Purchasers first receiving, either upon sale or through organization, cash and/or prior lein securities in an amount equal to the price paid by Purchasers for the same." * * * * *
Pursuant to the terms of the first mentioned contract, Dartt and Stark had made the original and three installment payments plus interest in the sum of $1,387.50 on the unpaid balance and had paid transfer tax in the sum of $1,028.59, all of which totaled $14,916.09 when, on January 18, 1935, they offered to assign to petitioner "all of our right, title and interest in two agreements dated the 28th day of September, 1934" in consideration of petitioner's assumption "of all liabilities arising in connection with the said Agreements" including the $14,916.09 theretofore *380 paid. Petitioner accepted the offer on January 21, 1935. On this date there remained accumulated and unpaid on Winona's gold bonds, interest of approximately $144,000. Interest of $3,960 was then due on Winona's gold notes. No interest had been paid on either obligation for three years. The bonds were secured by a mortgage on all of Winona's assets. The maturity date of the bonds was March 1, 1949. The maturity date of the notes was December 1, 1937. Petitioner was formed for the purpose of acquiring and holding all of Winona's securities and stock. None thereof would have been acquired either by Dartt and Stark or by petitioner had they not been able to acquire all and thereby gain control of Winona's management, subject to the receivership, as well as its outstanding obligations. Upon obtaining these assets an investment account, contemporaneously set up on petitioner's books, was debited with $100,000. The consideration expressed in the agreement relating to the purchase of the gold notes, being the "10% interest in Winona," was not reflected on the books though a journal entry did refer to petitioner's assumption of the liabilities of Dartt and Stark under the two agreements *381 of September 28, 1934. The liability to Dartt and Stark for the $14,916.09 previously paid under the purchase agreement was set up on the corporate books as an account receivable. In December 1936 Reid was obligated to Dartt and Stark in the amount of $10,000 less certain proceeds obtained from the sale of part of the securities included in a collateral pledge securing the obligation. On December 12, 1936, Dartt and Stark entered into an agreement with Reid pursuant to which Reid assigned to them the remainder of the securities pledged to secure his indebtedness to them and assigned to petitioner the "10% interest in Winona" in full satisfaction of such $10,000 indebtedness. Dartt and Stark realized approximately $2,000 from all the collateral securing the $10,000 loan and Reid received $8,000 for the Winona notes instead of a "10% interest in Winona." Petitioner, without cost to it, was relieved of its obligation to convey such interest. The $8,000 credited by Dartt and Stark on Reid's indebtedness to them was the substituted consideration paid by Dartt and Stark for the Winona notes. No part of this amount was charged to petitioner but was a capital contribution to it. The cost *382 basis of the notes to Dartt and Stark and the basis thereof for gain or loss to petitioner was $8,000. In August 1935 petitioner paid the balance owing on the $100,000 purchase contract. To secure the required funds, it borrowed $50,000 from its stockholders on open account. This sum was realized through equal loans of $12,500 from each of the four interested families. Dartt and Stark at the same time loaned petitioner an additional $20,000 evidenced by a non-interest bearing note secured by a pledge of all the Winona securities and stock. Thereupon the Chase National Bank released the bonds and stock from the prior pledge to it, theretofore made by Insull and Reid, and placed the securities and stock to the order of Dartt and Stark. Reid thereupon turned over the notes to the same men who held all of such securities and stock as petitioner's nominees. During the taxable years ending November 30, 1937 and 1938, petitioner received, respectively, $19,500 and $2,500 in complete retirement of the Winona gold notes in the principal amount of $22,000. Petitioner applied the sums received in reduction of the total cost basis of the entire group of Winona's securities and stock obtained *383 under assignment of the above mentioned contracts and did not report any gain or loss on the transaction. Respondent determined that the $100,000 was the total cost of the bonds, notes and stock of Winona and allocated it between the bonds and notes in proportion to the principal amounts thereof and thus determined a cost basis to petitioner for the notes in the amount of $2,680. On the basis of this allocation respondent determined that $17,124.55 of the $19.500 received by petitioner as payment on the notes in the taxable year 1937 represented gain and that $2,195.45 of the $2,500 received by petitioner as payment on the notes in the taxable year 1938 represented gain. The deficiencies determined against petitioner for the taxable years 1937 and 1938 are based upon such alleged gains. The bonds, notes and capital stock of Winona here in question have never been listed on an exchange and were never traded in except as hereinabove set forth. During the taxable year ended November 30, 1939, petitioner received $4,000 from Winona on account of interest accrued on the bonds since their purchase. This sum was paid directly to Dartt and Stark for petitioner's account. On November 16, *384 1939, petitioner's directors passed the following resolution: "RESOLVED, that $3.989.66 of payments made to Messrs. Dartt and Stark be for account of equalizing their advances to the Company and that the sum of $715.23 be paid to E. C. Isele for the same purpose as and when cash is available." The latter amount was paid in cash to Isele in the taxable year 1940 and was reported by him as income in that year. Petitioner's books were adjusted to show that the above sum paid to Dartt and Stark was compensation and it was charged to operating expense. Petitioner claimed a deduction in such sum upon its return for the taxable year ended November 30, 1939, for compensation paid. Respondent disallowed the deduction. Neither Dartt nor Stark reported the item as income, or at all, on their individual income tax returns. However, petitioner now claims that the amounts stated in the resolution were paid to Dartt, Stark and Isele as interest on the excess of their advances to petitioner over those made by the Reid family. Since Dartt and Stark were co-partners the excess attributable to their families was consolidated. Their advances included those evidenced by the collateral note as well *385 as the open account. The amount of the payments provided by the above resolution was computed by multiplying such excesses by four per cent per annum for a four-year period. Thus, Dartt and Stark were permitted to keep $3,989.66 of the $4,000 which they had received from Winona on petitioner's behalf. Further income was received by petitioner from Winona during the taxable year ended November 30, 1940. On October 16, 1940, petitioner's directors resolved to pay interest at the rate of five per cent per annum for a five-year period on the "equal" advances made by the stockholders to petitioner. In the meantime, Frazer and wife had purchased a one-fifth interest in the claims based on such advances. The total amount so computed as interest was $11,174.90. Petitioner issued to the claimants its 90-day non-interest bearing notes for such alleged interest obligations in amounts as follows: $2,234.98 each to Harry Dartt, Lee P. Stark and L. V. Reid, $2,234.98 to A. Frazer and T. C. Frazer, jointly, $1,005.81 to E. C. Isele and $1,229.17 to K. A. Isele. The amount of $715.23 paid to Isele in 1940 as interest and the amount of $11,174.90. being the total of the 90-day "interest" notes issued *386 by petitioner in 1940 were claimed as deductions in petitioner's tax returns for its taxable year 1940. The deductions were disallowed by respondent. At the time the stockholders made advances to petitioner there was no agreement or understanding with reference to the payment of interest either on the equal advances or on excess amounts. Such interest was paid to offset income for tax purposes. At the request of Reid, Dartt, Stark and Isele, Frazer investigated and negotiated for the purchase of two other short line railroads with headquarters at Jamestown. New York, and Springfield, Illinois, respectively. Negotiations, in both instances, extended through the years 1939 and 1940, and, in connection therewith, Frazer made ten trips to Jamestown and three to Springfield. He also conducted extensive correspondence with representatives of the railroads as well as Isele with copies going to Dartt, Stark and Reid. It was contemplated that other interests should join with Reid, Dartt, Stark, Isele and Frazer in the purchase of these lines. Petitioner was not mentioned in connection with either proposed purchase. Formal offers were made in both cases in behalf of Frazer and his "associates." *387 They were not accepted. For such services Frazer was paid $3,000 by petitioner during the taxable year ended November 30, 1940. Within the same year Reid. Dartt, Stark and Isele were each paid $1,800 as compensation for services rendered to petitioner. In 1940 petitioner's tax adviser had recommended the distribution of petitioner's assets prior to the end of the taxable year in order to avoid the imposition of burdensome taxes on income coming from Winona. On November 22, 1940, a meeting of petitioner's directors was held. The minutes of such meeting contained the following: "The Chairman stated that one of the purposes of the meeting was to consider and take action with respect to the distribution of the assets of the company in complete liquidation and a subsequent dissolution. "Thereupon, after a full discussion, upon motion duly made, seconded and unanimously carried, the following resolutions were adopted: "RESOLVED, that the officers of this company be and they hereby are authorized and directed, subject to the obtaining of necessary consents, to pay or cause to be paid all debts and obligations of this company in accordance with a schedule of distribution presented to *388 the meeting, namely: a distribution of bonds of The Winona Railroad Company at the rate of $4. for every $1. of debt of the company with an equitable cash adjustment for odd dollars plus a pro rata proportion of Winona stock based on the relation of bonds distributed to total bonds held by the company; and to distribute the remaining assets to the stockholders in proportion to their respective rights, to be subject to all claims for taxes, etc., that may subsequently be asserted against the company, including income taxes for the current fiscal year, and to execute and file any and all such instruments and to take any and all such action as may be necessary or desirable to dissolve this company in the manner provided by law, and "FURTHER RESOLVED, that the officers of this company be and they hereby are directed to forward a schedule of the proposed distribution to all creditors and stockholders for the purpose of obtaining their written consent to such dissolution." At that time petitioner's assets consisted of Winona bonds in the face amount of $737,500, 9,996.61 shares of Winona stock and $638.55 in cash. The bonds and stock were on accommodation loan to Dartt and Stark with the *389 approval of all creditors-stockholders and were pledged by the former to the Chase National Bank to secure a note. Pursuant to the resolution, a schedule of final distribution of these assets was sent to all creditors and stockholders and a signed consent thereto was received from each prior to November 30, 1940. Appended to the schedule of distribution was the following note: "The foregoing distribution is subject to liabilities paid before distribution and all claims for taxes, etc., that may later be asserted against the company." Included as a part of petitioner's debts in payment of which distribution of assets was to be made were the aforementioned 90-day interest notes. Physical possession of the bonds and stock remained at the Chase National Bank. Petitioner's journal, ledger and tax return for the year ended November 30, 1940, showed its capital stock to be still outstanding, that the 90-day interest notes and open accounts were payable and that its assets consisted of Winona's stock and bonds. On December 27, 1940, a certificate of petitioner's dissolution was received from the Delaware Secretary of State and closing entries were thereupon made on petitioner's books. *390 By agreement dated the same day the former creditors-stockholders placed the bonds and stock with Isele and Stark as escrow agents expressly continuing, however, the accommodation loan to Dartt and Stark. Petitioner distributed its assets, consisting of a small amount of cash and the Winona stock and bonds, (1) to its creditors in extinguishment of their claims and (2) to its stockholders. The distribution of all of its assets was made subsequent to its taxable year ended November 30, 1940, to wit, in December 1940. Petitioner's income and excess-profits tax returns for the taxable year ended November 30, 1937, were filed on February 14, 1938. Gross income stated therein was $300. Properly includable but not included in its income tax return for such taxable year was an amount represented by the profit realized on the liquidation in that year at face value of the principal of $19,500 of the $22,000 of Winona gold notes, the latter having a basis to petitioner for gain or loss of $8,000. The amount of such profit was in excess of 25 per cent of the gross income stated in the return. The notice of deficiency was mailed to petitioner on January 22, 1942. Petitioner did not in writing *391 or otherwise consent to the extension of the period prescribed by law for the assessment of income and excessprofits taxes for the taxable year ended November 30, 1937. Opinion The first question presented is petitioner's claims of error in the adjustments of its income for the taxable years 1937 and 1938 which resulted in the determination of the deficiencies against it for those years. It raises no issue as to the penalty determined if tax liability is found in respect of such years. The deficiencies for those years were based on respondent's holding that petitioner realized a gain of $17,124.55 in 1937 and $2,195.45 in 1938 as a result of the payment of the principal amount of the Winona gold notes. The determination of whether a gain was realized from the retirements of the notes depends on whether the notes have a determinable cost basis to petitioner apart from the cost basis of the Winona bonds and stock or as an allocable part of the total cost to petitioner of such notes, bonds and stock. Both parties view the acquisition of the Winona bonds, notes and stock as a single purchase of a conglomerate of assets. Petitioner contends that the purchase price of such conglomerate *392 was $100,000 plus the obligation to convey to Reid a "10% interest in Winona" (under the conditions set out in our findings of fact) and that it is impossible to allocate to any one of the three items purchased any part of the total purchase price. It contends, therefore, that there is no determinable or allocable cost basis for the notes alone and that until the total purchase price of the three items is recovered no gain will be realized. Respondent contends that the total purchase price was $100,000 and as a basis for the deficiencies for the years 1937 and 1938 he allocated such purchase price between the bonds and the notes according to the relative face values thereof. He thus determined a cost basis for the notes of 2.68 percent of $100,000, or $2,680. He allocated no part of such purchase price to the stock and did not include the "10% interest in Winona" as a part of the consideration for the purchase. Therefore, the basic question presented respecting the determined deficiencies for the taxable years 1937 and 1938 is whether the notes have a determinable cost basis. It appears obvious that the purpose of petitioner's organization and the transactions by which it acquired *393 through Dartt and Stark the stock and securities in question was to gain control of Winona management as an inseparable concomitant to the acquisition of the notes and bonds. The stock would not have been purchased without the securities or any part or all of the securities without the stock. Unquestionably the two contracts whereby the stock and securities were transferred to petitioner were the means employed to effectuate one integrated plan. However, it does not follow that the consideration expressed in each of the contracts is attributable to both. The contract first set forth in our findings is confined by its literal terms to the sale of the bonds and stock for the consideration of $100,000. These assets were all owned by Insull and Reid and they executed the contract as sellers. The record does not disclose what portion of the bonds or stock each owned. By virtue of the terms of that contract Dartt and Stark came into the unconditional ownership of all of such bonds and stock. While it appears that they would not have purchased the bonds and stock had not Reid at the same time executed the contract for the conveyance of the gold notes to them, the consideration for the latter *394 conveyance was to Reid alone, who was the sole owner thereof. The expressed consideration for this conveyance was the obligation of the purchasers to convey to Reid a "10% interest in Winona" subject to the conditions set forth in our findings. The two contracts, therefore, taken at their face, express a consideration for the bonds and stock separate and distinct from that expressed for the notes. Such separateness of consideration is not inconsistent with the controlling plan or purpose of Dartt and Stark to acquire all or none of the assets conveyed by the two contracts. Since the effectuation of such controlling purpose does not require an interpretation of the contracts as meaning something other than that clearly and unambiguously expressed therein, we are impelled to hold that the consideration for the bonds and stock was $100,000 and that the consideration for the notes was the obligation to convey to Reid a "10% interest in Winona." There is, therefore, no basis for holding either that the considerations expressed in the two contracts are insegregably combined as the cost basis of the conglomerate of the bonds, stock and notes, as contended by petitioner, or that the total *395 cost of the assets named is $100,000 and that a part thereof is allocable to the notes as contended by respondent. The original consideration for the Winona notes was the agreement of Dartt and Stark to transfer and deliver to Reid a "10% interest in Winona" subject to certain conditions set forth in their contract of September 28, 1934. However, on December 12, 1936, a transaction was effected between the parties to the above mentioned contract whereby Reid relinquished his right to the specified interest in Winona by assigning such interest to petitioner and in lieu thereof received a credit of $8,000 on notes he owed to Dartt and Stark. The effect of this transaction was to modify the contract of September 28, 1934, by substituting a consideration of $8,000 for the Winona notes in lieu of the agreement to transfer to Reid the specified interest in Winona. On January 21, 1935, petitioner assumed the obligations imposed on Dartt and Stark by the contract of September 28, 1934. By its acceptance of the assignment from Reid and its acceptance of a capital contribution from Dartt and Stark of the amount of the substituted consideration for the notes, to wit, $8,000, petitioner acquiesced *396 in the modification of the contract substituting $8,000 as the consideration for the notes. Hence, the basis of the notes to petitioner for gain or loss is $8,000. Accordingly, we hold that petitioner realized taxable gain in 1937 and 1938 on the payment of the notes in the face amount of $19,500 and $2,500, respectively, computed on a cost basis of $8,000 for the notes in the total amount of $22,000. Our holding that taxable gain was realized in the taxable year 1937 necessitates consideration of petitioner's further contention that no deficiency in tax can be determined for that year because of the three-year limitation provision of section 275(a), Revenue Act of 1936. We have found as facts that petitioner's income and excess-profits tax returns for the taxable year ended November 30, 1937, were filed on February 14, 1938; that the amount of gross income stated therein was $300; that the cost basis to petitioner of the Winona notes totaling $22,000 was $8,000; that $19,500 face value of such notes was paid in full in the taxable year 1937; that petitioner did not include the amount of gain realized by such payment in its tax returns for that year; and that the notice of deficiency *397 respecting the tax for 1937 was mailed January 22, 1942. It is obvious that the amount of gain realized by petitioner on the payment of the Winona notes in the taxable year 1937 was properly includable in its tax returns for that year and that such amount is in excess of 25 percent of the gross income of $300 stated in its returns. Therefore, the three-year limitation provided in section 275 (a) [1] does not apply but that the five-year limitation provided in section 275(c) [2] applies. The five-year period had not run when the notice of deficiency was mailed, hence we hold against petitioner on this contention. American Liberty Oil Co., Transferee, 1 T.C. 386. *398 The next issue involves the deductibility of three alleged interest items. Petitioner's stockholders became also its creditors by reason of certain advances made to the corporation. In no instance was it contemplated, when the advances were made, that interest would be paid for the use of the money. Nevertheless, in 1939 petitioner paid Dartt and Stark $3,989.66 and in 1940 it paid Isele $715.23 "for account of equalizing their advances to the Company." This is now claimed to have been in the nature of interest on "excess" advances. On October 31, 1940, petitioner issued to its creditor-stockholders its 90-day notes representing interest in a total further sum of $11,174.90. Such interest notes were gratuitously issued pursuant to resolutions of the directors of October 16, 1940. The amounts of alleged interest embraced "interest" for a four-year period in the case of the first two payments and a five-year period in the case of the third item represented by the 90-day notes. Deductions were claimed for these payments and disallowed by respondent. The situation here is virtually identical with that presented in the case of Miller Safe Co., 12 B.T.A. 1388, *399 wherein we said: * * * The petitioner * * * was under no obligation to pay interest during prior years because there was no such agreement. The stockholder was apparently advancing money without interest for reasons of his own. When the corporation resolved to pay him "interest" it was a gratuitous act. Strictly the amount was not interest. This language is equally apt in the instant proceeding. The decision requires this issue to be resolved in respondent's favor and it is so held. See also Jessie Chase, 19 B.T.A. 1040. Pursuant to the directors' resolutions, petitioner paid to T. C. Frazer $3,000 as compensation for services rendered and to its four officers-directors $1,800 each as "salary" in the taxable year ended November 30, 1940. Respondent disallowed the deductions claimed therefor. Section 23(a)(1) of the Internal Revenue Code authorizes a deduction of a reasonable allowance for salary or other compensation for personal services actually rendered. In each case whether allowances were purely for services, whether those services were actually rendered, and whether the allowances were in a reasonable amount are all, questions of fact. H. Levine & Bros. Inc. v. Commissioner, 101 Fed. (2d) 391. *400 Moreover, it is elementary that the services in question must have been rendered to the taxpayer claiming the deduction, not to someone else. Coosa Land Company, 29 B.T.A. 389, reversed on other grounds, 103 Fed. (2d) 555. T. C. Frazer was the president in Winona, petitioner's subsidiary. In 1939 and 1940, he investigated, with the view of purchasing, two other short line railroads with regard to the extent, character and value of their assets and their business prospects. Subsequently, he caused an offer to be submitted to their owners. While Frazer spent a large amount of time in connection with these matters and testified that it was on behalf of petitioner, the volume of correspondence which petitioner introduced in evidence on this issue clearly shows that Frazer's activities were not carried on in petitioner's behalf. On the contrary, it shows that he represented himself and petitioner's directors, not in their capacity as such, but as individuals interested in further profitable investments. In these circumstances, it follows that respondent's disallowance of the $3,000 deduction must be approved. We are also of the *401 opinion that the $1,800 payment made to each officer-director is not within the intendment of section 23(a)(1). Petitioner was formed as a means of closely holding Winona's securities and stock. It performed no other function whatever. Equal portions of its stock were held until in May 1940 by the four directors and their wives and thereafter in equal portions by them and Frazer and his wife. Significantly, equal "salaries" were paid to the directors, when income made payments possible, though there was considerable disparity between the services performed, such as they were. Isele kept the skeleton corporation books and made its simple tax returns. Stark acted as its attorney, though no evidence was offered as to what work this entailed. Dartt and Stark are said to have lent suggestions drawn from their wide experience in the transportation business. But petitioner was a holding company. Presumably such suggestions were made with reference to the conduct of Winona's operations, but this would not warrant a salary from petitioner. Coosa Land Company, supra.Certain of the men assisted Frazer in the negotiations for the purchase of the two other railroads. *402 This, as we have indicated, was on their personal account. So far as appears, the time spent in the interest of petitioner was only what might be expected of stockholders in the prudent management of a substantial investment. Monte Glove Company, 44 B.T.A. 539; Home Industry Iron Works, 8 B.T.A. 1267. On this point the burden was on respondent, the salary issue having been raised by amended answer. We think, however, that the facts clearly demonstrate that the $1,800 payments were merely a method of distributing corporate earnings in the guise of salaries and, hence, are nondeductible. Allegheny Amusement Co., 37 B.T.A. 12; Fifteenth & Chestnut Realty Co., 29 B.T.A. 1030;Connellsville Central Coke Co., 27 B.T.A. 771. The conclusions reached respecting the deduction issues increase petitioner's taxable income by the sum of the deductions disallowed. The deficiencies determined by respondent in petitioner's income and excessprofits tax and personal holding company surtax for the taxable year ended November 30, 1939, are approved. *403 Our approval of respondent's disallowance of the four $1,800 salary payments operates to increase accordingly the deficiencies in petitioner's income and declared value excess-profits tax for the taxable year ended November 30, 1940. However, the redetermination of the deficiency in personal holding company surtax for the taxable year ended November 30, 1940, depends upon the settlement of a final issue. Petitioner asserts that it distributed its assets in kind in complete liquidation prion to the close of the taxable year ended November 30, 1940. If this is true, then it had no undistributed profits at the close of that year upon which a personal holding company surtax could be laid. Colonial Enterprises, Inc., 47 B.T.A. 518. This would be so despite our disallowance of the contested deductions. The respondent contends that liquidation occurred after November 30, 1940. Thus, the question narrows down to one involving time of distribution in liquidation. Liquidation is a question of fact. W. F. Kennemer, 35 B.T.A. 415, affirmed 96 Fed. (2d) 177; John Milton, 33 B.T.A. 4. *404 Petitioner relies upon two events to sustain its position, namely, (1) the November 22, 1940 resolutions of its directors, which we have set out in our findings of fact, and (2) the receipt of signed consents to a schedule of distribution from all its stockholders prior to the end of the taxable year in question. Were these facts sufficient to effect a distribution in liquidation? The resolutions alone were not sufficient to effect such result. J. T. Hatfield, 32 B.T.A. 1; T. T. Word Supply Co., 41 B.T.A. 965, 980; W. R. Prescott, 31 B.T.A. 17, affirmed 76 Fed. (2d) 3. The first merely indicated an intent to dissolve and authorized the directors to distribute assets to its creditors in payment of its debts and the balance to its stockholders "subject to the obtaining of necessary consent." The resolutions further directed petitioner's officers to forward "a schedule of the proposed distribution to all creditors and stockholders for the purpose of obtaining their written consent to such dissolution." It is the consent to these schedules which comprises *405 the second event relied upon to prove the fact of distribution. Clearly, this event likewise was not a distribution in liquidation. In accordance with the specific terms of the first resolution, it was the receipt of these "consents" which was stated to be a condition precedent to the authorized distribution. Moreover, their characterization as a schedule of the proposed distribution contradicts the assertion that they constituted a constructive delivery of the assets. Finally, appended to the schedules themselves is the notation that the distribution "is subject to liabilities paid before distribution" and the record discloses that several debts were not discharged until after November 30, 1940. Other facts rebut petitioner's contention. Petitioner's journal and ledger and its tax return for the period involved, sworn to by two officers, all show that at the end of the taxable year 1940 petitioner owned the Winona bonds and stock and also show its liabilities for accounts and notes payable as well as its capital stock liability. If petitioner had distributed its assets to its creditors-stockholders as contended, these assets and liabilities would have ceased to exist. See Rex Brugh, 32 B.T.A. 898. *406 Moreover, had petitioner's creditors-stockholders actually surrendered their 90-day "interest" notes and their shares of stock for cancellation before November 30, 1940, such facts would have been easy of proof. Such facts, if proven, would have weighty significance in support of petitioner's contention in the instant case and would have suggested furthermore that petitioner's records and its tax return for the period involved had been erroneously kept and prepared. Since petitioner did not so prove, we assume that it could not do so. We hold that there was no distribution in liquidation prior to the end of the taxable year ended November 30, 1940. Since we have held that petitioner made no distributions in liquidation in its taxable year 1940 it is, therefore, not entitled to a dividends paid credit against its personal holding company basic surtax net income under the provisions of section 27(g) [3] of the Internal Revenue Code. Also even if the payments by petitioner to its stockholders as interest, salaries or other compensation, deductions for which we have disallowed, may alternatively be deemed distributions of taxable dividends, such payments or distributions are not the *407 basis of dividends paid credits against its basic surtax net income for the reason that such distributions were not pro rata, equal in amount, and with no preference to any share of stock as compared with other shares of the same class. Section 27(h) [4] of the Internal Revenue Code. Safety Convoy Company, Inc. v. Thomas, 139 Fed. (2d) 219. We have set forth in our findings of fact the names of petitioner's stockholders and the amount of their respective holdings; also the names of the stockholders to whom such payments were made and the amounts thereof. It is at once apparent that if such payments be deemed taxable dividends they were such preferential distributions as are referred to in section 27(h), supra. *408 We hold, therefore, that in computing petitioner's net income as a basis of its personal holding company surtax liability (chapter 2, subchapter A, Internal Revenue Code) for the taxable year 1940 the disallowance of the deduction of $7,200 as salaries paid should be taken into consideration and that the deficiency in personal holding company surtax for that year determined by the respondent should be increased accordingly. Decision will be entered under Rule 50. Footnotes
1. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - (a) General Rule. - The amount of income taxes imposed by this title shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period. ↩
2. (c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩
3. SEC. 27. CORPORATION DIVIDENDS PAID CREDIT. * * * * *
(g) Distribution in Liquidation. - In the case of amounts distributed in liquidation the part of such distribution which is properly chargeable to the earnings or profits accumulated after February 28, 1913, shall, for the purposes of computing the basic surtax credit under this section, be treated as a taxable dividend paid. ↩
4. (h) Preferential Dividends. - The amount of any distribution (although each portion thereof is received by a shareholder as a taxable dividend), not made in connection with a consent distribution (as defined in section 28 (a) (4)), shall not be considered as dividends paid for the purpose of computing the basic surtax credit, unless such distribution is pro rata, with no preference to any share of stock as compared with other shares of the same class, and with no preference to one class of stock as compared with another class except to the extent that the former is entitled (without reference to waivers of their rights by shareholders) to such preference.↩