Karl G. Von Platen v. Commissioner.
Karl G. Platen v. Commissioner
Docket No. 34982.
United States Tax Court
1953 Tax Ct. Memo LEXIS 218; 12 T.C.M. (CCH) 657; T.C.M. (RIA) 53203; June 9, 1953
*218 B. W. Flinn, C.P.A., City Hall Building, Rockford, Ill., for the petitioner. Robert R. Veach, Esq., for the respondent. RAUM
Memorandum Opinion RAUM, Judge: The respondent determined deficiencies in the income and victory taxes of the petitioner as follows: Year
Kind of Tax
Deficiency
1943
Income and victory
$ 49.42
1944
Income
3,034.38
The sole issue presented is whether the petitioner sustained long-term capital losses in 1943 and 1944 as the result of corporate distributions received by him in those years. The Commissioner refused to allow any deduction because liquidation of the corporation had not been completed in those years and it could not be known at that time what loss, if any, petitioner might ultimately sustain on his total investment in the corporation. The case was submitted, without trial, on a stipulation of facts which is hereby adopted as our findings of fact. On January 1, 1943, and for six months prior thereto, petitioner was the owner of 58,200 shares of common stock of the Von Platen-Fox Company (hereinafter referred to as the "Company"), a Michigan corporation incorporated in 1920. It was incorporated for the purpose of manufacturing, handling, purchasing, selling, *219 exchanging and dealing in timber and timber lands, lumber, and other wood or forest products. As of July 1, 1943, the total outstanding stock of the Company consisted of 206,770 shares of common stock, all of which was held by two family groups. Prior to and during the year 1943 the United States Government imposed ceilings on lumber prices, but did not impose ceilings on standing timber prices. At a meeting of the directors of the Company on April 2, 1943, the possibilities of liquidation as well as the possibilities of continuation of business were discussed, and it was moved that the directors recommend to the stockholders a program of liquidation and that the officers call a special meeting of the stockholders for the purpose of presenting such a program for their consideration. A special meeting of the stockholders was held on June 2, 1943; their attention was called to the fact that the Company's supply of available standing timber had reached a point where its mills could not be operated profitably "without the purchase of additional timber or the constant purchase of a large amount of logs, and that the purchase of logs was constantly becoming more and more difficult." Their *220 attention was also called to the fact that because of this situation a complete shutdown of one mill was imminent and that, while the other mills could continue for a short time, operations there could not be expected to be profitable unless long-range plans for the acquisition of additional timber could be made. After discussion, the stockholders adopted resolutions giving the directors authority to proceed with a plan for the "partial liquidation" of the Company; to take all steps necessary to carry out such plan, "including but not limited to the payment of or making provision for the payment of all debts and liabilities of the company; the performance, assignment, compromise or settlement of outstanding contracts and commitments of the company; the sale for cash or credit of any assets of the company to any person whatsoever, including but not limited to any present officers, stockholders or employees of the company; to shut down the mills or other properties of the company, or any of them, as and when it is deemed desirable; to dismantle such mills or other properties, thus shut down, and sell the same in parcels or in any other manner, any and all sales of assets to be at such *221 prices and upon such terms as the directors may in their judgment and discretion deem to be most advantageous for the stockholders." The directors were also authorized to make partial liquidating distributions out of paid surplus and capital to the stockholders in cash or in kind, such distributions to be "in partial cancellation or redemption of outstanding stock of the corporation." The Company proceedes forthwith to carry out the plan. During its fiscal year ended July 31, 1944, it sold its Iron Mountain, Trout Creek, Basswood, Mass, Gibbs City and Berglund mills, including buildings, equipment and mill sites (with minor exceptions); its inventories; its autos, trucks, trailers, tractors, plows, road builders, etc.; its Government bonds; some real estate; approximately one-half of its timberlands; and its furniture and fixtures. At a meeting of its board of directors on March 24, 1944, its president stated that every tangible asset had been sold except certain cut-over and selectively logged lands, its Iron Mountain real estate, and about 400 acres of timber near the Porcupine Mountains, and that practically all of the obligations of the Company, with the exception of income taxes, *222 had been paid. At the same meeting the statement was made that "the operations of the company were practically completed". The Company's balance sheets, as of July 31, 1943 and July 31, 1944, showed the following assets: Assets
1943
1944
Current
Cash
$ 49,523.79
$ 43,900.14
Notes and Accts. Rec., Less Reserves
159,035.10
42,305.02
Inventories
280,630.08
Government Bonds
100,620.00
50,218.50
Fixed
Timberlands
483,343.78
234,913.60
Land and Mill Sites
27,567.39
22,687.44
Bldgs., Mchy. and Equip. Less Reserves
92,151.79
4,573.32
Investments and Long-Term
Stocks
8,426.00
2,825.00
Mtg. and Long-Term Notes
46,145.04
169,872.56
Land Contracts
22,724.37
8,025.36
Other Assets
Prepaid and Deferred
103,910.85
4,483.09
Other
370.75
Total Assets
$1,374,448.94
$583,804.03 The Company's president formed his own company to engage in the lumber business and made substantial purchases of the Company's assets. The life insurance policy carried by the Company on him was assigned to his individual company. He advised the board of directors of the Company at a meeting held on July 1 and 2, 1943, that, by reason of the liquidation program, his salary contract with it was automatically terminated. The following are the total assets shown on the balance *223 sheets of the Company as of July 31st of each of the years listed below: 1942
$1,676.013.39
1943
1,374,448.94
1944
583,804.03
1945
480,113.22
1946
462,702.68
1947
420,971.45
1948
362,697.79
1949
354,190.16
1950
170,004.95
As assets were sold, the directors at various times adopted resolutions directing the officers of the Company to make distributions to stockholders in proportion to their respective holdings in cancellation of stock. The shares of stock surrendered and the amount of the distributions made during 1943 and 1944 were as follows: Date of
Shares of stock
Cash
authorization
cancelled
distributed
July 2, 1943
31,015.50
$206,770.00 *
August 30, 1943
9,490.73
75,000.00
September 27, 1943
15,795.04
125,000.00
December 6, 1943
44,839.68
353,000.00
January 21, 1944
12,658.22
100,000.00
June 15, 1944
23,255.62
150,000.00
The shares of stock surrendered by the petitioner during the years 1943 and 1944 and the amount of the distributions received by him were as follows: Shares
Amount
surrendered
received
1943
28,468.37
$224,606.37
1944
10,108.75
70,368.03
The *224 records of the Company disclose that it had 78,021 M feet of uncut timber standing as of July 31, 1943, and that of this amount approximately 23,000 M feet represented timber which had been selectively logged and would not be available for cutting for years. Based on 1943 operations of the Company, when 15,746 M feet were cut, the uncut timber as of July 31, 1943, was sufficient to run approximately only three years. The annual sales and operating profit (loss) of the Company for the years 1930 to 1950, inclusive, were as follows: Net Profit
Year
Sales
(Loss)
1930
$1,194,951.92
($100,836.51)
1931
879,142.52
( 283,352.89)
1932
400,538.44
( 276,500.06)
1933
422,684.79
63,165.48
1934
559,771.12
1,182.88
1935
711,852.72
( 12,751.62)
1936
566,196.45
14,706.69
1937
995,653.24
59,144.20
1938
905,742.91
( 39,567.86)
1939
803,709.96
( 57,923.04)
1940
1,075,400.50
( 13,125.54)
1941
1,715,518.65
98,702.79
1942
2,487,800.69
127,513.97
1943
1,771,819.45
42,226.34
1944
968,265.12
210,295.20
1945 (No sales)
$17,893.91
( $ 5,427.18)
1946 (No sales)
14,198.27
( 3,144.89)
1947 (No sales)
28,686.99
7,390.52
1948 (No sales)
11,848.48
( 4,573.88)
1949 (No sales)
8,862.98
( 8,218.37)
1950 (No sales)
1,294.82
( 25,257.87) The charter of the Company expired on August 14, *225 1950, and was not renewed. In December 1950, the Company distributed to its stockholders all of the assets then owned by it and thereafter ceased to exist. The petitioner contends that the distributions he received from the Company in 1943 and 1944 were distributions in partial liquidation within the meaning of Sections 115 (c) and (i) and that the losses sustained by him as a result of these distributions were long-term capital losses the deduction of which was subject to the limitations contained in Section 117 (d) (2). The respondent contends that these distributions were made pursuant to a program of complete liquidation of the Company and that individual distributions of capital made in a program of complete liquidation do not constitute transactions upon which losses are recognized or deductions allowed under the Internal Revenue Code. He urges in support of this contention that in the process of complete liquidation of a corporation, a stockholder cannot determine his ultimate gain or loss until such time as the final distribution is made or the amount thereof reasonably known and that the transactions here involved do not meet the specific requirement of Regulations 111, Section *226 29.23 (e)-1, that deductions "must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period * * *". The question presented to this Court for decision has been narrowed by the stipulation of the parties, as follows: "The parties hereto agree that in the event this Court finds that the distributions of capital made to petitioner by the Company during the years 1943 and 1944 were made pursuant to a program of partial liquidation that no deficiency is due from the petitioners for the years 1943 and 1944; and that if this Court finds that said distributions of capital were made pursuant to a program of complete liquidation that the determination of the Commissioner for the years 1943 and 1944 is correct and that a deficiency is due and owing by petitioner as set forth in the notice of deficiency, * * *." The stipulation appears to be in accordance with the theory of the decision in Florence M. Quinn, 35 B.T.A. 412, where it was held that a corporate distribution made in the process of a complete liquidation must be applied against the aggregate basis of all the stockholder's shares, notwithstanding his contemporaneous *227 surrender of some of his shares in connection with the distribution. Petitioner seeks to avoid the consequences of the Quinn case by denying that there was any program of complete liquidation. His argument in support of his contention that the distributions received by him should be treated as "amounts distributed in partial liquidation" is that the stockholders of the Company at their meeting on June 2, 1943, authorized its "partial liquidation" and provided for "partial liquidating distributions" and "partial cancellation or redemption of outstanding stock of the corporation"; that their action at this meeting was the basis for the subsequent action of the board of directors; that no mention was made in resolutions of either the stockholders or the directors of a final liquidation; and that the distributions made fall within the definition of "amounts distributed in partial liquidation" in Section 115 (i) because they were distributions in cancellation of part of the stock of the Company which was surrendered. Whether a corporation is in the process of partial liquidation or complete liquidation at the time distributions are made by it is a question of fact to be determined from *228 evidence of its activities. The name given to the distributions in corporate minutes or resolutions is not controlling, and neither is the fact that they provided for the cancellation or redemption of a part of its stock at the time distributions were made. If the distributions are made as steps in the process of complete liquidation they must, under the Quinn case, be applied against the aggregate basis of all of the shareholder's shares and he realizes no gain until the distributions exceed his basis and sustains no loss unless the total of all distributions received is less than his aggregate basis. The stipulation of the parties herein seems to accept that theory, and our task is narrowed to determine merely whether there was here in fact a program of complete liquidation. A corporation is in the process of complete liquidation if at the time distributions are made it is engaged in winding up its affairs by realizing upon its assets, paying its debts, and distributing any remaining balance to its stockholders. "It differs from normal operation for current profit in that it ordinarily results in the winding up of the corporation's affairs, and there must be a manifest intention *229 to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined thereto." T. T. Word Supply Co., 41 B.T.A. 965, 980. The stockholders on June 2, 1943, authorized the sale of its assets, the payment of its debts, and liquidating distributions. "What was done thereafter was not in the ordinary course of carrying on its current business for profit." James P. Gossett, 22 B.T.A. 1279, affirmed, 59 Fed. (2d) 365 (C.A. 4), 60 Fed. (2d) 484. The Company immediately engaged upon a program of selling assets, many of which had been used in the operation of its business, paying its debts, and distributing cash not needed for such payments to its stockholders. These acts were incidental to a continuing purpose to wind up the Company's business. On March 24, 1944, its president reported to the directors that "every tangible asset of the corporation had been sold except the cut-over and selectively logged lands, the Iron Mountain real estate and about 400 acres of timber near the Porcupine Mountains", and that "practically all obligations of the company had been paid and that the only substantial debt remaining outstanding *230 was whatever the company might owe for income tax". On this same date the directors adopted a motion to continue to pay its president a salary "although the operations of the company were practically completed". In these circumstances, we are not impressed with petitioner's statement on brief that partial liquidation, and not complete liquidation, was contemplated in 1943 and 1944 because at the end of the latter year and for six years subsequent thereto the Company continued to hold timber. The directors had the authority to sell this timber as well as the Company's other assets, and the fact that its sale was not effected until after 1944 is not fatal to the ultimate finding, which we make, that the distributions here involved were made pursuant to a program of complete liquidation of the Company. Decision will be entered for the respondent. Footnotes
*. In addition there was distributed pro rata to the stockholders on July 2, 1943, $34,380.00. par value of preferred stock in the Northern Paper Mills Company having a fair value equal to par value.↩