T. T. WORD SUPPLY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

T. T. WORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ANNA WORD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 90997, 93542, 93543, 93544.   Promulgated April 26, 1940.

*J. L. Lockett, Esq.*, and *Homer E. Mabry, Esq.*, for the petitioners.
*J. L. Backstrom, Esq.*, for the respondent.

972

OPINION.

ARNOLD: The Supply Co. filed a consolidated return for the year 1931, in which it deducted net losses of the Specialty Co. and the Texas corporation of $34,927.61. The respondent denied the right to make a consolidated return on the ground that the three corporations were not an "affiliated group", as defined in section 141 of the Revenue Act of 1928.[1] In determining the tax liability of T. T. Word and Anna Word for the year 1934, the respondent held that T. T. Word acquired all of the assets of the Texas corporation in exchange for the surrender of all of its stock and the cancellation of certain of its obligations, and realized a gain of $177,738.47, which was taxable to him and Anna Word on the community property basis. He found that the Supply Co. did not own the stock of the Texas corporation and the Specialty Co. in 1931, and that T. T. Word and not the Supply Co. owned the stock and obligations of the Texas corporation in 1934. In order to protect the interests of the Government, the respondent also notified the Supply Co. of his determination of a deficiency against it for the year 1934, which resulted from inclusion of the gain of $177,738.47 in its income. However, he here insists upon liability of the Supply Co. for the tax on such gain only in the event that we

---

[1] Sec. 141 (d) * * * an "affiliated group" means one or more chains of corporations connected through stock ownership with a common parent corporation if—

(1) At least 95 percentum of the stock of each of the corporations (except the common parent corporation) is owned directly by one or more of the other corporations; and

(2) The common parent corporation owns directly at least 95 per centum of the stock of at least one of the other corporations.

should hold that T. T. Word was not the owner of the stock and obligations of the Texas corporation in 1934.

A question for determination, common to these proceedings, is whether T. T. Word or the Supply Co. owned the stock of the Texas corporation. The issue in the proceeding of the Supply Co. involving the year 1931 turns upon ownership of the stock in that year and the issues in the proceedings of the Supply Co. and T. T. Word and Anna Word involving the year 1934 turn upon ownership in that year. In *Word Specialty Manufacturing Corporation*, Docket No. 68856, and *T. T. Word Supply Co.*, Docket No. 68857 (34 B. T. A. 974) we found as a fact that during the years 1929 and 1930 T. T. Word owned directly in excess of 95 percent of the stock of the Texas corporation, and that such stock issued to him had not been transferred by him since its acquisition. The evidence in the present proceeding shows that no change in ownership of the stock of the Texas corporation occurred from the time of its acquisition from the Tennessee corporation in 1926 to the time of its surrender in 1934. The respondent has pleaded and here argues that the question of ownership of the stock of the Texas corporation has been adjudicated in the former proceedings and that our decision therein is *res judicata*. At the hearing the respondent introduced in evidence the pleadings, decision, and orders of the Board in the former proceedings, and the petitioners were permitted to introduce evidence bearing on the ownership of the stock, over an objection that it was incompetent to the extent that it should be found to be inconsistent with our former decision. The petitioners rely upon such evidence to establish that the stock was owned by the Supply Co. in 1931 and 1934 and that it was not owned by T. T. Word.

The evidence shows, and the petitioners do not deny, that legal title to the stock was taken in the name of T. T. Word upon its acquisition in 1926 from the Tennessee corporation. T. T. Word testified that he acquired the stock for and on behalf of the Supply Co., that he held it as trustee for its benefit, and that the only reason for taking title in his own name was that his counsel, who advised him throughout the negotiations, directed that this be done so as not to offend the antitrust law of Texas. His counsel is now deceased, but another witness has corroborated his statement that such advice was given. We considered testimony to the same effect in the former proceedings, but were not convinced by it for the reason that other evidence indicated that T. T. Word owned the stock in his individual capacity, and for the further reason that no authority prohibiting a Texas corporation from owning stock of another corporation had been brought to our attention. In their brief the petitioners refer to provisions of the Texas statutes, civil and penal, relating to mo-

nopolies and combinations in restraint of trade. Vernon's Ann. Civil Stats., art 7427; Vernon's Ann. Penal Stats., art. 1633. Both articles define a monopoly as a combination or consolidation of two or more corporations, when effected by the following method, among others:

Where any corporation acquires the shares or certificates of stock * * * or the physical properties or any part thereof, of any other corporation * * * for the purpose of preventing or lessening, or where the effect of such acquisition tends to affect or lessen competition, whether such acquisition is accomplished directly or through the instrumentality of trustees or otherwise.

The statute is aimed at situations where there is an intent to lessen, or an acquisition has a tendency to effect a lessening of, competition. The evidence here is not directed to proof of intent or the effect of the transaction. However, it is sufficient to show that a direct acquisition of the stock by the Supply Co. could not have been intended, and would not have tended, to lessen competition between the Supply Co. and the Texas corporation. The two corporations were engaged in the same business—the sale of oil and gas well supplies. The Supply Co. was a selling company organized in 1926, and at that time or soon thereafter, the manufacturing branch of the Texas corporation's business was taken over by the Tennessee corporation. In January 1926 the Texas corporation consigned all manufactured products, supplies, materials, and implements then owned by it to the Supply Co. for sale by the latter on a commission basis. The contract of consignment states that the Texas corporation is discontinuing its business generally. Thus, the acquisition of the stock by the Supply Co. would not fall within the statute. If a transfer of the stock to the Supply Co. would be under the ban of the antimonopoly statute of Texas, transfer in the name of T. T. Word in trust for the Supply Co. would likewise be. The statute applies whether the acquisition of the stock is accomplished directly or through the instrumentality of a trustee. The reasons assigned for taking title in T. T. Word's name are therefore unconvincing. There is no evidence that any express trust was created, nor is there any evidence that a trust resulted by reason of the payment by the Supply Co. of any part of the consideration for the stock.

There is, so far as the evidence shows, no written contract covering the purchase of the stock. The contract of March 10, 1926, does not purport to sell the stock. The evidence merely shows that in the negotiations with the receivers T. T. Word also sought to acquire the stock and that several days before the contract of March 10, 1926, was executed the stock was delivered to him, and at the same time assets of the Texas corporation of the value of $38,000 were delivered to the Tennessee corporation. We regard the holding of the stock by T. T.

Word and his subsequent acts as more persuasive of his ownership than his mere assertion of trusteeship. Consolidated income tax returns for the years 1926, 1927, and 1928 were filed on behalf of the Supply Co. and the Texas corporation. They were signed by Word as president of the Supply Co. and in them he definitely set forth that he owned the stock and certified that there were no equitable owners. Such allegations of ownership, as stated in our former decision:

* * * represent * * * a conclusion reached within a short time after completion of the transactions by one chiefly concerned with the result, and adhered to without change of position for a long period of time. It would require strong evidence to overcome the facts so consistently represented by the person primarily concerned with the outcome of these proceedings.

The above returns were filed under the Revenue Act of 1926, which permitted affiliation if 95 percent of the stock of two or more corporations was owned by the same interests. Sec. 240 (d). Beginning with the, taxable year 1929, affiliation was limited to chains of corporations connected through stock ownership with a common parent, if at least 95 percent of the stock of each corporation, except the common parent, was owned directly by one or more of the other corporations, or if the common parent owned directly at least 95 percent of the stock of at least one of the other corporations. Revenue Act of 1928, sec. 141 (d). T. T. Word promptly accommodated his interests to this change, in so far as his dealings with the Government were concerned, by filing consolidated returns for 1929 and subsequent years in which he represented that the Supply Co. was the owner of the stock of the Texas corporation. This shift of position took place four years after the transaction of purchase, and was intended to secure the benefits of affiliation under the new statute, but in his dealings with his wholly-owned corporation he did not change his status with respect to the stock. He made no sale or donation of the stock to the Supply Co. His conduct is strong evidence that he intended to and did retain ownership of the stock in himself.

In his dealings with the Government with respect to his individual tax liability, T. T. Word made further representations which are inconsistent with the position now taken by him. As hereinafter shown, all of the consideration paid for the stock and obligations. was derived from the assets of the Texas corporation. The consideration included $130,000 in cash which was borrowed from the Union National Bank on a note which T. T. Word was required to endorse. Consistently, in each of the years 1926 to 1932, T. T. Word deducted substantial amounts of interest on his income tax returns, which the record shows was the interest paid to the Union National Bank on the note. This was a representation that the indebtedness

was his own, and, therefore, if any of the consideration paid for the obligations was in fact consideration in part for the stock, it was paid with money borrowed by T. T. Word for the purpose.

This evidence and the uncontradicted testimony that no change in the ownership of the Texas stock took place from the time it was originally acquired from the Tennessee corporation in 1926 until the surrender of the stock in 1934, together with all the other facts and circumstances shown by this record, warrants the conclusion that the stock was owned by T. T. Word at all times between March 1926 and May 8, 1934, and we so hold. Our conclusion is in accord with that reached in the former proceedings on substantially the same evidence, and our former conclusion is quite persuasive, since the petitioners have here proven no other facts or circumstances tending to show that T. T. Word did not own the stock.

Since the conclusion thus reached is adverse to the contentions of the petitioners, it is unnecessary to pass upon the question whether, under the doctrine of *res judicata*, our former adjudication of ownership of the stock is conclusive upon either the Supply Co. or T. T. Word and Anna Word. It may be noted, in conclusion, that the petitioner has produced no evidence whatever respecting the ownership of the stock of the Specialty Co. during the year 1931. For this reason, even if we should hold that the Supply Co. owned all of the Texas stock in that year, we would not be justified in disturbing the respondent's action in rejecting the consolidated return on which the aggregate net loss of both subsidiaries was deducted.

The ownership of the obligations, consisting of $141,086.14 of mortgage notes and $759,274.02 of unsecured claims, had its origin in the contract with the receivers of March 10, 1926. That contract expressly recites that the mortgage notes have been delivered to the Supply Co. and in terms sells, transfers, and assigns the unsecured claims to the Supply Co. In addition other assets, apparently of doubtful value, are transferred to other parties. Thus the legal title to the notes and claims clearly was placed in the Supply Co. All of the documents thereafter executed recognize the Supply Co. as the owner of these obligations. Such evidence would be quite convincing were it not for the fact that in the field of taxation we "are concerned with substance and realities, and formal written documents are not rigidly binding." *Helvering* v. *Lazarus & Co.*, 308 U. S. 252, and *Higgins* v. *Smith*, 308 U. S. 473. All of the stock of the Texas corporation was acquired by T. T. Word, and he also was the owner of all of the stock of the Supply Co. The evidence of the entire dealings between T. T. Word and these corporations must be closely scrutinized, and we proceed to examine it for the purpose of determining whether T. T. Word was the beneficial owner

of the obligations. The entries on the books of the two corporations and T. T. Word are no more than evidential and, in case of conflict, must give way before the true facts. *Doyle* v. *Mitchell Brothers Co.*, 247 U. S. 179; *Watson-Moore Co.*, 30 B. T. A. 1197.

In March 1926 the Supply Co. was a newly organized corporation with a paid-in capital of $10,000. It had some earnings over a period of two months. The Texas corporation had assets which were represented to the Union National Bank as having an appraised net value of almost $500,000. That value did not take into account the $900,000 which it owed the New York corporation on the mortgage notes and unsecured claims. The contract with the receivers provided for a payment of $160,000 in cash. The Supply Co. neither had the cash with which to make the purchase nor financial standing by which it could borrow the money. The $160,000 was raised by withdrawing $30,000 from the cash funds of the Texas corporation and borrowing $130,000 from the Union National Bank on Word's endorsement. It was placed in the Supply Co.'s bank account, and paid by check to the receivers. The remainder of the consideration consisted of promissory notes of the Supply Co. for $30,000, which were executed and endorsed by T. T. Word as required by the contract. The bank took a promissory note of the Supply Co. for the $130,000. It not only required the endorsement of the note by T. T. Word, but it also insisted that the note of $759,274.02 payable to the Supply Co. and secured by some $220,000 of bills receivable of the Texas corporation be pledged as security for the note for $130,000. T. T. Word testified that all of the assets of the Texas corporation were pledged to the bank. Payments made from time to time on the notes to the bank and to the receivers were made from assets of the Texas corporation, except about $60,000. The latter amount was paid by the Supply Co. While the evidence does not show any reimbursement of the Supply Co. through direct cash payments, it does show that the Supply Co. credited the Texas corporation with 80 percent of the proceeds collected on all sales made on its behalf, and charged against such credits the payments made by it on the notes. When the Texas corporation was dissolved in 1934, the Supply Co. was indebted to it on that account to the extent of $109,420.99. Thus all of the consideration paid, both for the stock and the obligations, in the amount $228,000, was as a matter of fact paid through withdrawal of funds or assets of the Texas corporation. The Supply Co. did not use any of its own funds or its own credit.

The book entries relating to the transaction are set forth in detail in our findings of fact. The petitioners oppose their consideration on the ground that they are not proof of the actual facts, and, with respect to the entries on the personal books of T. T. Word, the latter

in his testimony disclaims responsibility for such books and says that he did not know of their existence until they were shown to him tor the first time in 1933 by a revenue agent. We think the personal books are what they purport to be and are competent to corroborate facts otherwise established. At the time the stock and obligations were acquired in 1926, T. T. Word employed an accountant for the purpose of guiding his bookkeeper in setting up accounts reflecting the entire transaction. The accountant had a personal conference with T. T. Word, in which the details of the transaction were discussed, and thereafter he gave written bookkeeping instructions based on the facts supplied by T. T. Word. The accountant advised, among other things, that the books of the Texas corporation should not recognize the personal dealings of T. T. Word and the books of the Supply Co. should record only such matters as involved it, but that the personal books of T. T. Word should contain a complete history of all transactions and a record of his dealings in the securities of the Texas corporation. On the personal books the notes were set up as assets of T. T. Word at a cost of $190,000, and the interest paid from year to year on the loan from the bank was charged as additional cost, in the amount of $14,807.35. Both of these amounts were carried on his books as liabilities. The Texas corporation set up on its books an account entitled "T. T. Word, Personal, Notes Payable", which was credited with $759,274.02. It set up a "T. T. Word Loan Account", to which it charged amounts paid by it to the receivers and the bank from time to time on their notes. The Supply Co. set up on its books an "investment account" with the Texas corporation, in which it charged $190,000, representing cash acquired from Texas corporation and the bank. Over the period 1926 to 1932, this account was credited with payments aggregating $190,000, including about $60,000 paid by the Supply Co. directly to the bank. We think the entries on the Supply Co. books were made to reflect the passing of the money through it and not an investment on its own account. In addition to the books, the consolidated income tax returns of the Supply Co. and the Texas corporation for the years 1926, 1927, and 1928 contain balance sheets wherein, under the heading of "other assets", the items of "Investment Account $190,000" and "Liquidation Account $64,097.49" are listed with the designation "T. T. Word Personal." These records, in connection with other facts and circumstances, indicate quite clearly that the obligations received under the contract of March 10, 1926, were acquired for the account of T. T. Word.

We are of the opinon and find that at all times from March 1926 to May 8, 1934, T. T. Word was the beneficial owner of the obligations of the Texas corporation.

Having determined that T. T. Word was the owner of the stock and the beneficial owner of the claims, the question remains whether he realized a taxable gain upon the surrender of the stock and cancellation of the claims in exchange for the assets of the Texas corporation in 1934. The respondent held that the transaction resulted in a complete liquidation, and that, since T. T. Word owned the stock, the gain resulting from the exchange was taxable income of the community estate under section 115 (c) of the Revenue Act of 1934. In computing the amount of the gain, he included in the assets acquired, as obligations owing by T. T. Word, the amounts of $190,000 and $38,000, and interest payments of $14,897.25, which as the evidence shows, are amounts which were withdrawn from the Texas corporation and used to pay for the stock and claims. He allowed a basis of $38,000 for the stock, and $190,000 (less recoveries of $12,219.84) for the claims. The contention made in his brief is that, since T. T. Word owned the stock and claims, and since he had recovered the entire cost thereof through disposal of the assets of the Texas corporation, the receipt of the remaining assets in liquidation resulted in a closed transaction, and the fact that the assets were transferred direct to the Supply Co. is immaterial. The petitioners contend that, even if the stock and claims were in fact owned by T. T. Word, the transaction of 1934 was a merger or consolidation of the Supply Co. and the Texas corporation, and that, since T. T. Word owned no more after the consolidation than he did before, and, by reason of the cancellation of the claims, he in fact owned less—he realized no taxable gain.

Section 115 (c) of the statute provides that "amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock", and that the "gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112." Section 115 (i) provides that "the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." The liquidation of a corporation is the process of winding up its affairs by realizing upon its assets, paying its debts, and appropriating the amount of its profit and loss. It differs from normal operation for current profit in that it ordinarily results in the winding up of the corporation's affairs, and there must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its

activities must be directed and confined thereto. A mere declaration is not enough, and the question whether a corporation is in liquidation is one of fact. *W. E. Guild*, 19 B. T. A. 1186; *Fred T. Wood*, 27 B. T. A. 162. In the present case, the first formal declaration to dissolve was made in the resolution of May 8, 1934. Pursuant to that resolution the Texas corporation transferred its assets in exchange for the surrender of its stock and the cancellation of its principal obligations, and shortly thereafter was dissolved. Prior to the acquisition of the stock and claims and while the negotiations were pending with the receivers, T. T. Word organized the Supply Co. as a selling corporation, with a comparatively small paid-in capital. On January 6, 1926, the Supply Co. entered into a contract with the Texas corporation, under which the Supply Co. took over all of a large quantity of manufactured products, materials, supplies, and implements which the Texas corporation had on hand, for sale on a commission basis. The facilities theretofore used by the Texas corporation in the manufacturing branch of its business were transferred to the Tennessee corporation, which thereafter was to carry on that branch of the business, and the Supply Co. arranged to secure its future supply of manufactured products from the Tennessee corporation and sell them on consignment. The contract of January 6, 1926, recites that the business of the Texas corporation has proven unprofitable and that "it is understood and agreed that Lucey Manufacturing Corporation of Texas is discontinuing its business generally", and it authorizes the use of its facilities by the Supply Co. "until sold and disposed of." In connection with the loan of $130,000 from the Union National Bank, T. T. Word pledged all the assets of the Texas corporation as security, and represented that the Supply Co. was acquiring the stock, business, and assets of the Texas corporation and the note for $759,274.02, and that as the assets so acquired were liquidated the proceeds would be applied in liquidation of the $130,000, and thereafter the note for $759,274.02 would be canceled out by the Supply Co. absorbing the then remaining assets and liabilities. This evidence shows not only that there was a complete liquidaton in 1934, but that the Texas corporation was in process of complete liquidation beginning in 1926 and in the intervening years up to and including 1934, and the withdrawals during the period 1926 to 1932 must therefore be regarded as a series of distributions intended to be in complete liquidation of the corporation. *James P. Gossett*, 22 B. T. A. 1279; affd., 59 Fed. (2d) 365; 60 Fed. (2d) 484; *Rollestone Corporation*, 38 B. T. A. 1093; *Kent Oil Co.*, 38 B. T. A. 528; *Gaston & Co.*, 39 B. T. A. 640. In such cases the stockholder is entitled to have the amounts distributed applied against the aggregate basis of all his shares, and he realizes

no taxable income until the distributions exceed the basis. *Florence M. Quinn*, 35 B. T. A. 412; *Alvina Ludorff et al., Executrices*, 40 B. T. A. 32; *Norman Cooledge*, 40 B. T. A. 110, 115. In the present case, the acquisition of the claims and the acquisition of the stock were integral parts of a single plan, and it was contemplated that, after all the liabilities incurred in the purchase had been satisfied out of the assets of the Texas corporation, the claims would be canceled with the surrender of the stock and the corporation would be liquidated. We think, therefore, that the petitioners are entitled to have the distributions applied against the cost of both the stock and the claims, and, as the distributions were equal to the cost, no gain was realized until the remaining assets were distributed in 1934. All amounts distributed in excess of the aggregate cost of the stock and claims constituted gain from the liquidation in 1934.

In view of our conclusion that T. T. Word was the owner of the stock, and that he was the beneficial owner of the claims, the facts that the Texas corporation in the resolution authorizing the exchange referred to the stock and claims as property owned by the Supply Co., that it conveyed the assets direct to the Supply Co., and that the latter released the lien of the mortgage notes and canceled the note for $759,274.02, are insufficient to show that he did not receive the assets in liquidation. As sole stockholder and owner of the claims, he was the only person entitled to the assets upon dissolution of the corporation. The Supply Co. had no interest in the Texas corporation, either as stockholder or creditor. It merely held the legal title to the claims for the benefit of T. T. Word. In receiving the assets and in canceling the liens and claims, it acted solely as the nominee or agent of T. T. Word. The assets could only pass to the Supply Co. through T. T. Word. The fact that the Supply Co. issued no stock or other thing of value for them indicates quite clearly that it acquired them as a donation or contribution of additional capital from him. The transfer of assets in complete liquidation to the wholly owned corporation of T. T. Word without consideration is analogous to those cases in which it has been held that a transfer of corporate assets to a partnership composed of the former stockholders is a distribution in the form of a liquidating dividend. See *E. C. Huffman*, 1 B. T. A. 52; *Joseph Joseph*, 6 B. T. A. 595; affd., 26 Fed. (2d) 532; *John F. Prindible*, 16 B. T. A. 187; *Commonwealth Improvement Co.*, 20 B. T. A. 1189; affd., 287 U. S. 415.

The fact that in the complete liquidation T. T. Word, as creditor, surrendered claims of the face value of about $900,000 does not warrant the conclusion that nothing was distributed to him in liquidation. The evidence does not show that the claims were worth their face amount. They were purchased, along with some assets of

the North Texas Supply Co., from outside creditors for $190,000. They were not exchanged solely for the assets, but, as the resolution of the stockholders shows, the consideration for the assets consisted of cancelation of the claims and surrender of the stock. We are of the opinion that the assets of the Texas corporation were distributed to T. T. Word in complete liquidation, and that the value of such assets, to the extent that they exceeded the basis of the stock and claims, constituted taxable income for the year 1934.

The contention of the petitioners that the transaction was a merger or consolidation and no taxable gain was realized is without merit. Whether any gain realized from the distribution is not to be recognized depends upon whether the transaction falls within any of the exceptions contained in section 112. Sec. 115 (c). The provisions of section 112 are exceptions to the rule taxing gains, and may not be availed of by a taxpayer unless he establishes a transaction coming clearly within their terms. *Warner Co.*, 26 B. T. A. 1225; *Dolomite, Inc.*, 28 B. T. A. 1271; *John C. Shaffer*, 28 B. T. A. 1294; *Charles Hall*, 31 B. T. A. 125. We need not decide whether there was a merger or consolidation, or a statutory reorganization. That of itself is not sufficient for nonrecognition of any gain under section 112. The taxpayer must further bring the transaction within one of the specific provisions of that section. See *Cortland Specialty Co.* v. *Commissioner*, 60 Fed. (2d) 937. The only provisions which can have any possible application are subdivisions (b) (3) and (b) (5). The former provides that no gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. The transaction does not fall within this language, since the stock of the Texas corporation was not exchanged solely for stock of the Supply Co. Subdivision (b) (5) provides that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control of the corporation. Here, there was a transfer of property by T. T. Word to the Supply Co., but it was not transferred solely for stock of the transferee. The Supply Co. issued no stock whatever, and, as indicated above, the assets passed to the Supply Co. as a contribution of additional capital. Since the petitioners have failed to point out any provision of section 112 which would exempt from taxation the gain derived from the distribution, it follows that, under the express provisions of section 115 (c) and 112 (a), the gain realized is subject to tax. *Coxe* v. *Handy*, 103 Fed. (2d) 873.

The amount of gain realized, as computed by the respondent, is shown in our findings of fact. The cash, prepaid items, real estate, and finished goods, amounting to $35,668.76, are not disputed, nor is the item of liabilities assumed, amounting to $15,589.07, questioned by either party. The item of furniture and fixtures should be reduced to $2,000, since the evidence shows, and the respondent concedes, that to be the proper value. We find no reason to disturb the respondent's valuation of the receivables at $8,701.68. The receivables on the books of the Texas corporation amounted to something over $75,000 and a reserve was set up for doubtful notes and accounts amounting to about $67,000, and in 1934 the accounts and reserve were transferred at the same figures to the Supply Co.'s books. T. T. Word determined at that time that $8,701.68 of the accounts would probably be collected. The petitioners now contend that this figure should be reduced to $1,500, and rely upon the testimony of T. T. Word that they were not worth more than that amount. He further testified that only $1,300 has since been collected. We agree with the respondent that the witness' estimate made at the time of taking over the accounts is a better indication of their value at that time than one made by him several years later.

The Supply Co. accounts of $109,420.99 and $3,035.63 represent the balance in a current account due by the Supply Co. to the Texas corporation out of the proceeds of supplies sold on consignment. There is no evidence that this was not a valid claim or that the Supply Co. was unable to pay it. The only argument advanced by the petitioners is that these accounts were never transferred to T. T. Word in the so-called merger or consolidation of the two companies. From what has been said above, they clearly were assets of the Texas corporation, which passed to T. T. Word along with the other assets and to the Supply Co. by way of a capital contribution.

We have found as a fact that the gain realized by T. T. Word was $170,455.08. That amount should be included in computing the net income of T. T. Word and Anna Word on the community property basis. In accordance with the concession of the respondent, this conclusion requires the elimination of gain in the amount of $177,738.47 from the taxable income of the Supply Co. for the year 1934.

The final question is whether the Supply Co. is entitled to a deduction of $10,424.55 for bad debts on its return for the year 1931. Deductions for bad debts are allowable only in the year in which two things occur—ascertainment of worthlessness and charge-off. *Paul Pryibil*, 31 B. T. A. 164. The accounts were charged off during 1931, and the question for determination is whether they were ascertained to be worthless in that year. The ascertainment need not be

absolute, but the taxpayer must make some reasonable and intelligent investigation of the facts concerning the claim, and the circumstances disclosed must be such as reasonably to generate the belief that it is in fact worthless. *American Trust Co.* v. *Commissioner*, 31 Fed. (2d) 47; *Sherman & Bryan, Inc.* v. *Blair*, 35 Fed. (2d) 713; *Clark* v. *Commissioner*, 85 Fed. (2d) 622; *Kahn* v. *Commissioner*, 108 Fed. (2d) 748; *Eastern New Jersey Power Co.*, 37 B. T. A. 1037. We can not rest our determination upon the conclusions of witnesses alone, in the absence of facts upon which their conclusions are based. *Merrill Trust Co.*, 21 B. T. A. 1395; *Higginbotham-Bailey-Logan Co.*, 8 B. T. A. 566; *Avery* v. *Commissioner*, 22 Fed. (2d) 6. The facts presented fail to show that the petitioner was justified in concluding in 1931 that the accounts were worthless. T. T. Word testified that in the latter part of 1931 he ascertained that they could not be collected. In support of his conclusion he stated that the debtors were operators and contractors in the East Texas Oil Field, that, as a result of overproduction in 1931, the oil industry fell into a chaotic condition, the price of oil declined to 10 cents per barrel, and the State authorities finally shut in the wells. He also stated that he attempted to make collections, but that none of the debtors could pay anything. He did not disclose, however, what facts, if any, he ascertained concerning the financial condition of the debtors. The failure of a debtor to pay on demand or to pay promptly does not justify determination that the debt is worthless, in the absence of any investigation of the debtor's solvency. *Joseph Kahn*, 38 B. T. A. 1417; affd., *Kahn* v. *Commissioner*, 108 Fed. (2d) 748; *Prescott State Bank*, 11 B. T. A. 147. Cf. *Clark* v. *Commissioner*, supra. In the case of the Anderson account, it appears that the debtor was able to pay, and the petitioner testified that he was willing to do so. Anderson owned two oil wells which he sold two months after his account was charged off. The proceeds of that sale were used to discharge the balance of his debt. The collection of all of these accounts was undoubtedly delayed because of the unusual conditions, but there is no proof that they were worthless; and that they were not worthless is corroborated by the fact that, as soon as the condition of the oil industry improved, the accounts were paid. *Joseph Kahn, supra; Richards & Hirschfeld, Inc.*, 24 B. T. A. 1289. The respondent's disallowance of the deductions is approved.

Reviewed by the Board.

> *Decision will be entered for the respondent in Docket No. 90997, and under Rule 50 in Docket Nos. 93542, 93543, and 93544.*