JOSEPH OLMSTED AND VIRGINIA OLMSTED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Olmsted v. Commissioner
Docket No. 8326-81.
United States Tax Court
T.C. Memo 1984-381; 1984 Tax Ct. Memo LEXIS 295; 48 T.C.M. (CCH) 594; T.C.M. (RIA) 84381; July 24, 1984. Aaron P. Rosenfeld, for the petitioners. Mark S. Feuer, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' 1974 and 1975 Federal income taxes in the amounts of $6,501.30 and $2,418.98, respectively. The sole issue [1] for determination is the character of distributions made by a corporation to its shareholders, including petitioners, during the taxable years in issue. Petitioners contend that the distributions constitute amounts distributed in complete liquidation of a corporation and *297 are, therefore, entitled to exchange treatment under section 331. [2] By contrast, respondent asserts that the distributions are subject to dividend treatment under section 301. Determination of the character of the distributions depends on whether or not the corporation was in a status of complete liquidation when it made the disputed distributions to its shareholders. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in New Canaan, Connecticut, when they filed their 1974 and 1975 *298 joint Federal income tax returns with the Internal Revenue Service Center at Andover, Massachusetts, and when they filed their petition in this case. During both of the years in issue, petitioners owned 12,133 shares of common stock in the Sunday Creek Coal Company ("Sunday Creek" or "the corporation"). Petitioners' basis in this stock was $627,560.30 as of December 31, 1972. Sunday Creek is an Ohio corporation incorporated in 1919. [3] From its inception until 1927, the corporation was operated as a coal mining company by J. S. Jones ("Jones"), the owner of approximately 90 percent of its common stock during this period. Following Jones' death in 1927, his stock was placed in a trust for the benefit of his three daughters. William Tytus ("Tytus"), the husband of Jones' eldest daughter, assumed control of corporate operations. From 1927 through 1930, the corporation continued to actively engage *299 in coal mining. In addition, in order to provide cash flow to finance these mining operations, the corporation sought to lease the rights to oil and gas in its property. On or about October 10, 1927, the corporation and the Preston Oil Company ("Preston") [4] executed a lease under which Preston obtained the rights to all oil and gas on property then owned and not otherwise leased by the corporation. The term of the lease was for 50 years and for so long as oil and gas were being produced from the property. [5] The lease provided for the corporation to be paid a royalty of one-eighth of the sales price of oil and gas produced from the property. Tytus was killed in a mine disaster on November 5, 1930. From that date and for ten years thereafter, the corporation's coal mining operations became increasingly unsuccessful. By April 1, 1940, the corporation was *300 no longer an operating coal company engaged in coal mining. During the period from 1940 through 1960, the corporation's only [6] activity related to coal mining was the lease of corporate coal property to other mine operations. With the demise of its coal mining operations, the corporation confined its activities to other spheres. As of 1960, its operations consisted of receiving royalties paid by lessees of oil and gas rights and of coal rights on corporate property, income from the rental of approximately 400 homes located in various mining camps on corporate property, and income from the sale of timber cut by independent contractors hired by the corporation. In addition, the corporation as of that time received income from a machine shop which it operated at Corning, Ohio. [7]
The shares of stock formerly owned by Jones were released from the trust to *301 its beneficiaries on September 9, 1960. As of 1970, the shares were held as follows: Sallie Jones Sexton ("Sallie"), a daughter of Jones, held 16,934 shares; Virginia Jones Olmsted ("Virginia"), another daughter of Jones and one of the petitioners in the instant case, held 12,133 shares; and the children of Tytus, grandchildren of Jones, held approximately 18,000 shares. From 1960 through 1969, Sallie operated the corporation. During that period, she expanded corporate operations to include a coal brokerage business. While expanding corporate operations, Sallie also expanded her personal wealth at the expense of the corporation. She improperly diverted a substantial amount of funds from Sunday Creek to finance other corporations which she owned and operated, and she otherwise pledged a substantial amount of corporate assets for her personal debts. In response, John S. Tytus ("John"), a son of Tytus and a grandson of Jones, filed a derivative shareholder suit in the Court of Common Pleas of Franklin County, Ohio. Among the named defendants were Sunday Creek, Sallie, Virginia, and Joseph Olmsted, one of the petitioners in the instand case.The action was dismissed without prejudice *302 on February 4, 1970. In consideration for this dismissal, two agreements were executed. The first of these, executed in December of 1969 and January of 1970, was a shareholders' agreement entered into by John, Sallie, and Virginia. [8] Therein, it was agreed that Sallie would resign as director, officer, employee, and agent of the corporation. It was further agreed that Sallie and Virginia would establish a voting trust into which they would place all of their corporate shares. John agreed that, with respect to the naming of directors, he would vote his own shares in favor of the persons named in the voting trust agreement. In regard to the future of the corporation, all parties agreed as follows: The parties agree that [Sunday Creek] will, as soon as the same can reasonably be accomplished, wind up its corporate affairs, and that an orderly plan of voluntary dissolution, plan of liquidation, sale of stock or disposition of assets shall be accomplished, and that all things necessary and proper under the law should be done to accomplish the same. *303 As required by the shareholders' agreement, Sallie and Virginia executed a voting trust agreement on January 12, 1970. The trust agreement empowered five independent parties as voting trustees and directed that these same parties be elected as the board of directors. [9] The trust agreement reiterated the liquidation intent expressed in the shareholders' agreement. [10] At a special meeting of corporate directors held on January 30, 1970, the existing board of directors and officers resigned, the voting trustees were elected as directors, and new officers were elected. *304 The new officers and directors were aware of the liquidation mandate contained in the shareholders' and voting trust agreements. Liquidation was considered on several occasions, even before a formal plan of liquidation was adopted. As reviewed below, steps were taken toward terminating corporate operations. Upon assumption of control of Sunday Creek in 1970, the new board and officers began to take inventory of corporate assets and liabilities. They engaged a public accounting firm to examine corporate books and records and to determine Sunday Creek's financial Status. They also began selling corporate assets and paying existing corporate liabilities. During 1970, the coal brokerage business was terminated, and the machine shop at Corning was sold. Various properties were sold and additional sales were attempted during that year and the following years of 1971, 1972, and 1973. On October 30, 1973, the board of directors adopted resolutions incorporating a plan of liquidation. At a special meeting held on December 6, 1973, the shareholders unanimously adopted the identical plan of complete liquidation and dissolution recommended by the directors. [11] Among its other terms, *305 the plan provided for the sale of assets, [12] the cessation of business, [13] and the making of liquidating distributions. [14] In discussing the anticipated cessation of business, the plan noted: A complicating factor in this Plan of liquidation results from the fact that a portion of Sunday Creek's property is subject to a mortgage payable by Chesapeake and Ohio Railway Company (which was assumed from The Hocking Valley Railway Company and The Buckeye Coal and Railway Company) to the Central Trust Company of New York, Trustee, to secure the payment of bonds authorized in the principal amount of $20,000,000, bearing interest at 4 1/2% per annum, maturing July 1, 1999. The Board of Directors does not anticipate being able to release the Sunday Creek property subject to that mortgage prior to the July 1, 1999 maturity date of the bonds. The mortgage in question covers other property in addition to the Sunday Creek land.The principal amount due on the bonds is believed to greatly exceed the value of the Sunday Creek land subject to the mortgage. Accordingly, the Board of Directors believes the Sunday Creek land subject to the mortgage cannot be sold until the mortgage on that property *306 has been released. Thus, while Sunday Creek shall accomplish the Plan by a sale of all of its assets as soon as feasible, Sunday Creek may be unable to effect the sale of the property subject to that mortgage until the total indebtedness has been satisfied and the mortgage terminated. [Emphasis added.] *307 The property owned by Sunday Creek was located in southeastern Ohio, in the economically depressed area commonly referred to as Appalachia. As of 1970, when the new officers and directors assumed control, the corporation owned in excess of 45,000 acres of land in fee and mineral holdings combined. As of January 1, 1974, shortly after adoption of the plan, the corporation owned approximately 41,340 acres of land, of which approximately 22,000 acres were in fee, with another 19,000 acres in mineral rights. Of these 41,340 acres, 10.009 were encumbered by the aforedescribed mortgage securing the payment of bonds.Additional acreage was held subject to existing leases of coal and mineral rights. For example, a total of approximately 13,703 acres were subject to coal leases with the Peabody Coal Company ("Peabody"). Furthermore, the earlier lease of oil and gas rights to Preston had not expired as of the onset of liquidation, leaving an additional 22,327 acres restricted. After the plan was adopted, the directors began the process of selling off assets to liquidate the corporation. Every asset of the corporation is and has been for sale since the date of the plan. However, existing *308 restrictions on various parcels of land or mineral rights prevented the immediate sale of much of Sunday Creek's land. The depressed economic conditions of the geographic area of Appalachia also hampered marketability. Nonetheless, repeated good faith efforts were made to sell corporate lands, and the record in this case is replete with information as to both actual and attempted sales. The Consummated sales afforded some success to Sunday Creek in its effort to sell its real property. From 1970 through 1981, 38 sales occurred, totalling approximately 4,650 fee acres and 4,900 mineral acres. Thirty-four of these sales, totalling approximately 2,500 fee acres and 4,000 mineral acres, occurred from 1970 through 1975, including the years in issue in the instant case. As a result of these sales, the 45,000 total acres owned by Sunday Creek as of 1970 and reduced to 41,340 by 1974 were further reduced to 36,800 by 1981. [15]
In addition to its other sales efforts, Sunday Creek has attempted to sell its leased property to its lessees. These efforts *309 have been unsuccessful. The leases with Peabody include substantially all of the corporation's easily mineable coal property, and Preston leases substantially all of the corporation's oil and gas property. The corporation also sought to contract its operations through methods other than sales of land and related rights. Upon termination of the coal brokerage business in 1970, the mansion from which Sallie had run that operation was sold. An office maintained in Columbus, Ohio, was also closed, and the existing machine shop in Corning was sold.All corporate records were moved to a rented house in Nelsonville, Ohio, in 1970. After several years and two location changes due to lease terminations, the corporation purchased a single family house in Nelsonville for approximately $35,000.00. This building is used for record storage and office functions. The only other personal assets of Sunday Creek are a truck used to monitor and inspect its real estate holdings, an automobile used by an officer and employee, and minimal office equipment. Since 1970, purchases have been made to replace these assets as necessary, but no additions have been acquired. Except for the house in Nelsonville, *310 Sunday Creek has not purchased any real property since 1970. From 1971 onward, the corporation has never had more than three full-time employees. As of the time of trial, two of the current employees were 71 and 69 years old, and the third was being trained to replace one employee and to assist the other. Furthermore, the replacement board of directors has succeeded in eliminating the corporation's long-term liabilities. Existing long-term liabilities of $180,000.00 were reduced to $5,000.00 during taxable year 1973, were totally eliminated during taxable year 1974, and were never thereafter revived. Since 1972, Sunday Creek has not borrowed any money for a term longer than one year. In addition, Sunday Creek has not engaged in coal mining, coal brokerage, oil and gas developments, reforesting, machine shop maintenance, business development, or any other active endeavor. The corporation has, however, maintained existing leases for coal or oil and gas rights, and new leases have been entered into since adoption of the plan. Respondent asserts that this continuing leasing operation is an ongoing business activity.Petitioners, however, argue that leasing in this manner is tantamount *311 to selling, a lease being a payment vehicle for assets which are, in effect, sold when extracted from property. Sunday Creek continued to receive income during the years since assumption of control by the new board of directors in 1970 and even during the years since adoption of the plan late in 1973. The corporation's income during 1974 and 1975 did not significantly decline from amounts received in earlier years. [16] Sunday Creek reported coal royalties of $86,849.50 for 1974 and $78,131.79 for 1975; oil and gas royalties were $39,106.03 for 1974 and $77,388.77 for 1975; timber sales were $45,257.81 for 1974 and $30,436.28 for 1975; and rental income [17] was $20,487.21 for 1974 and $17,989.25 for 1975. Property sales generated no income during these years, as a combined loss of $25,123.20 resulted from sales during 1974, and no sales occurred during 1975. *312 Beginning in 1973, Sunday Creek paid to its shareholders amounts which it characterized as liquidating distributions. The following chart sets forth both the net income of the corporation after payment of taxes and the amount of distributions made during each year since adoption of the plan, including the years at issue in the instant case: Year
Net Income (Loss)
Distribution
1973
($ 2,177.65)
$ 57,116.00
1974
14,542.48
80,364.00
1975
41,461.09
120,546.00
1976
15,019.65
200,910.00
1977
126,651.29
241,092.00
1978
202,588.99
200,910.00
1979
302,999.99
281,274.00
1980
268,772.09
401,820.00
1981
218,670.66
361,638.00
Totals
$1,188,528.59
$1,945,670.00
Petitioners received distributions from Sunday Creek in 1974 and 1975 in the amounts of $24,266.00 and $36,399.00, respectively. [18] They reported these receipts as liquidating dividends on Schedule B of each year's tax return. However, petitioners reported no tax due on account of these items. Instead, they treated the amounts as distributions in complete liquidation of a corporation and applied them to reduce their basis in their Sunday Creek stock. *313 In his notice of deficiency, respondent rejected this treatment of the amounts received. He determined that the distributions were dividends, taxable as ordinary income to the extent of available corporate earnings and profits, with the excess applied to basis recovery.Based on the available earnings and profits of Sunday Creek, respondent determined that the entire $24,266.00 received in 1974 was ordinary income. For 1975, $18,953.00 was determined to be ordinary income and $17,446.00 was basis recovery. OPINION Section 301(c) sets forth the rules for taxability of distributions by a corporation to its shareholders. It provides for ordinary income treatment to the extent of dividends, [19] followed by basis recovery for any excess, and capital gain treatment for any remaining excess.[20] However, section 331, in effect, eliminates the ordinary income component of gain for distributions in complete liquidation of a corporation. It provides in relevant part: [21]
(a) GENERAL RULE.-- (1) COMPLETE LIQUIDATIONS.--Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock. * * * (b) NONAPPLICATION OF SECTION 301.--Section *314 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property * * *, in partial or complete liquidation. Thus, the proper tax treatment of the distributions in issue depends on whether or not Sunday Creek was in a status of liquidation during 1974 and 1975. Neither "liquidation" nor "complete liquidation" are defined in the Internal Revenue Code nor in the regulations under section 331. However, related section 1.332-2(c), Income Tax Regs., offers this presumably applicable standard: A status of liquidation exists when the *315 corporation ceases to be a going concern and its activities are merely for the purpose of winding up its affairs, paying its debts, and distributing any remaining balance to its shareholders. * * * Whether or not a corporation is in a state of liquidation is a question of fact. See T.T. Work Supply Co. v. Commissioner,41 B.T.A. 965, 981 (1940); Wood v. Commissioner,27 B.T.A. 162 (1932). Petitioners bear the burden of proving the fact of liquidation and, hence, that respondent's determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).Under the facts and circumstances of this case, we find that petitioners have carried their burden. This Court has applied a three-pronged test in making a factual determination of liquidation: (1) whether there is a manifest intention to liquidate; (2) whether there is a continuing purpose to terminate corporate affairs and dissolve the corporation; and (3) whether the corporation's activities are directed and confined to that purpose. Estate of Maguire v. Commissioner,50 T.C. 130, 140 (1968); T.T. Word Supply Co. v. Commissioner,supra at 980-981. *316 Each of these requirements is examined below. Manifest intent test. In the instant case, an intent to liquidate is manifest in the language of the plan and, apart from its words, in the fact of its existence: While the existence of a formal plan is neither required nor determinative, it is persuasive evidence of liquidation intent. As we stated in our opinion in R.D. Merrill Co. v. Commissioner,4 T.C. 955, 969 (1945): Such an agreement [i.e., a plan of liquidation] is not conclusive, but it is entitled to weight in seeking the solution to a problem which involves a question of fact upon which the intention of the board of directors of the distributing corporation has great materiality. * * * The intention of Sunday Creek's board of directors is apparent in the plan's requirements of the sale of assets, the cessation of business, and the making of liquidating distributions. These terms are consistent with the liquidation intent expressed in the earlier shareholders' and voting trust agreements. Furthermore, the business realities underlying these various documents support a finding of an intent to liquidate. Settlement of the derivative shareholder *317 suit brought by John was premised upon anticipated liquidation, and the attendant new directors were elected on account of their expertise in representing shareholder interests, and not in the coal business or related enterprises. Continuing purpose test. The liquidation purpose continued from at least the date of the plan until the time of trial. Throughout this period, the decision to liquidate remained constant. The activities of the corporation, as discussed below, evidenced this intent and supported the plan's mandate. During the years in issue, the amounts distributed to shareholders greatly exceeded the corporation's net income. [22] Distributions were more than five and one-half times net income during 1974 and almost three times net income during 1975. This pattern is demonstrative of a corporation in a status of liquidation with its accompanying contraction of assets. Consistent with this contraction, a reduction of fixed assets also occurred throughout the liquidation period. While it is a fact that must of Sunday Creek's land was not immediately saleable, it is also true that its sales efforts resulted in a gradual but substantial contraction of assets. From *318 1970 to 1974, the corporation succeeded in selling eight percent of its remaining acreage; from 1974 to 1981, an additional almost 11 percent of the remainder was sold. Further contraction of assets resulted from the practice of leasing which, while not sales, had the effect of depleting corporate assets. Respondent suggests that Sunday Creek was not in a status of liquidation, but rather was an ongoing entity with only a goal of liquidation in the indefinite future. We do not accept this interpretation of the clear language of the plan or the corporation's activities thereunder. It is true the directors recognized that complete liquidation could not be accomplished immediately. It is also true that various encumbrances on property and adverse sales conditions extended the liquidation period. These facts do not belie a current status of liquidation, however. Respondent's argument fails to understand *319 that liquidation is a process, not an event. As we stated in our opinion in Howell v. Commissioner,40 T.C. 940, 945 (1963): A plan of liquidation may extend over a number of years and may be carried out notwithstanding that the liquidating corporation is meanwhile engaging in some business activities. * * * The reasonableness of a liquidation period is not dependent on its length. Rather, deference is given to the liquidators as to both the length and manner of the liquidation process.As we said in R.D. Merrill Co. v. Commissioner,supra at 969: We should not, without good reason, overrule the judgment of the liquidators of such an enterprise. The length of time which may reasonably be required to liquidate the assets of the corporation as well as the determination of the manner of liquidation are matters soundly left to the discretion of the liquidators, who are charged with a duty of effecting a liquidation in such time and in such manner as will inure to the best interests of the corporation's stockholders. * * * In the case of Sunday Creek, we find no "good reason" to overrule the judgment of the board.There is no suggestion *320 of sham, of deliberate stalling, or of continuing business purpose. To the contrary, the plan resulted from an adversarial posture among shareholders. Liquidation provided a means of settlement of a lawsuit in which adverse parties desired to extricate themselves and their property from each other. Such setting is hardly conducive to a fictitious liquidation designed to disguise an ongoing business enterprise. The principal shareholders had no interest in maintaining the corporation. Rather, they had every incentive to dissolve it, including a contractual obligation to do so under the settlement terms of the lawsuit and its resulting agreements. Furthermore, the replacement board of directors was selected for the purpose of liquidating the corporation, and its efforts to do so were made in good faith. The testimony of various board members at trial was forthright and credible, and we find no justification for questioning its devotion to the plan of liquidation. The practical obstacles to immediate sale of all corporate assets existed prior to adoption of the plan and have been well documented, and the reasons for the extended liquidation period have been satisfactorily explained. *321 Under these circumstances, we find that any delays in sales did not evidence a deviation from the course of liquidation, but rather reflected legitimate business decisions made by the board of directors. The propriety of a period of liquidation extending over many years must be analyzed in the context of the facts and circumstances of each particular case. While unusual, extended liquidation is not without precedent, and several earlier opinions of this Court have upheld liquidations despite protracted time frames. In R.D. Merrill Co. v. Commissioner,supra at 970, the liquidating activities of a lumber company extended over nine years while timber cutting occurred.In holding that the corporation was in a status of liquidation, we noted that length of time does not determine this status: That the process of liquidation may extend over a period of many years has been held by this Court not to be fatal to a finding that a distribution may be one of a series of distributions in complete liquidation of a corporation. The corporation in the case of [T.T. Word Supply Co. v. Commissioner,41 B.T.A. 965 (1940)], was in the process of complete *322 liquidation from 1926 through and including 1934 and the Court held that withdrawals during the period from 1926 to 1932 "must therefore be regarded as a series of distributions intended to be in complete liquidation of the corporation." See also [Gaston & Co. v. Commissioner,39 B.T.A. 640 (1939)], wherein this Court recognized that the corporation there involved had been in process of liquidation since 1930, even though it appeared that at the time of this Court's decision in that case in 1939 the corporation was still engaged in liquidating its affairs and capital. We reiterated the principle that mere time does not negate substance in our opinion in Estate of Fearson v. Commissioner,16 T.C. 385 (1951), [23] a case which was factually similar to the instant case in a number of persuasive aspects. In Estate of Fearon, a 1919 liquidation resolution resulted from a lawsuit brought against a coal company by minority shareholders. Difficulties in land sales prevented the completion of the liquidation process. Consequently, the corporation was still in existence in 1948, although 29 years had elapsed since the date of the resolution. In the *323 interim, the corporation had continued to receive income from rents, interest, and royalties, as well as from sales of mineral rights, surface property, fixtures, and timber. The issue in Estate of Fearon was whether a corporate distribution to shareholders in 1942 was an ordinary dividend or an amount distributed in complete liquidation of a corporation. We resolved the controversy in favor of liquidation, stressing that, when disposing of corporate assets, speed at the expense of reasonableness is not required. We explained: Although even as late as the years 1942 or 1943 it had been impossible completely to dispose of all of its extensive holdings, the [liquidators] have conducted the liquidation in good faith by proceeding to sell and dispose of the assets as fast as they could advantageously, and without sacrificing their value. [Estate of Fearon,supra at 392.] * * * Nor is the length of time consumed fatal to a determination that the corporation was in the process of complete liquidation. The Commissioner may well expect the liquidation to be conducted in good faith but not that it be conducted in haste. * * * [Ibid. at 394.] *324 In Howell v. Commissioner,supra, we again found that a status of liquidation existed despite a period of 12 years between resolution adoption and corporate dissolution. It is noteworthy that, in Howell, it was respondent, rather than petitioner, who argued that the corporation remained in a status of liquidation. The issue before this Court was whether the nonrecognition provision of section 337 [24] was applicable to proceeds from sales of property within 12 months after the 1958 adoption of a liquidation plan. After examining the circumstances of that case, we concluded that the corporation in issue had, in fact, been in an uninterrupted status of liquidation since the earlier adoption of a liquidating resolution in 1946. Therefore, we found the 1958 purported plan to be superfluous and without legal significance. Since section 337 applied only to plans adopted on or after June 22, 1954, and only to liquidations completed within 12 months after plan adoption, the statute did not apply to a 1946 plan which remained in effect for 12 years. Instead, the predecessor of section 331 controlled. *325 Cases such as T.T. Word Supply Co.,supra;R.D. Merrill Co.,supra;Estate of Fearon,supra; and Howell,supra, make clear that time alone does not prevent continuation of a liquidation purpose. Similarly, in the case now before us, the delays encountered by Sunday Creek in its efforts to sell its assets do not alter our conclusion that the corporation was in a status of liquidation. We reject respondent's argument insofar as it relies on this factor. We conclude that the intent to liquidate was manifest at least as of the adoption of the plan by the shareholders in December of 1973; this purpose continued at least through 1974 and 1975, a mere one and two years after plan adoption. [25]
*326 Activities test. The third and final prong of the test for liquidation status is whether the corporation's activities were directed and confined to the purpose of terminating corporate affairs and dissolving the corporation. Liquidating activities include the sale of assets, the payment of corporate debts, and the distribution of liquidating dividends, if any, to the shareholders. See sec. 1.332-2(c), Income Tax Regs. Concomitant with these activities, there can be no ongoing business purpose in contravention of the goal of cessation. As we have noted, however, the termination of all business activities need not occur instantaneously. It is sufficient that activities are directed toward liquidation and that any ongoing operations are reasonable within the context of the plan of liquidation. See, e.g., Estate of Maguire v. Commissioner,supra at 143; Howell v. Commissioner,supra at 945. We explained the application of this standard in R.D. Merrill Co. v. Commissioner,supra at 970: The facts show that, although the liquidating process may have been slow and although operations pursuant *327 to the determined course of liquidation may have resulted in annual profits, nevertheless, without exception, the activities of [the corporation] were consistent with the ultimate liquidation and dissolution of the corporation.No new timber lands were acquired to replace depleted assets. The gradual contraction of the company's activities and their eventual disappearance was the inevitable result of the policy pursued by [the corporation]. * * * [Emphasis added.] Similarly, the policy pursued by Sunday Creek will inevitably result in asset and activity contraction and in the eventual cessation of the corporation. These results are already apparent in the years at issue and those which followed, and we support the reasonable expectation of the board of directors that they will continue on their predestined course until the corporation can be dissolved. Since adoption of the plan, Sunday Creek's activities have been aimed solely at eventual corporate termination. Long-term obligations have been eliminated, and current borrowing has been limited to short-term financing consistent with the liquidation process. All corporate assets have been available for sale, reasonable *328 efforts to effect sales have been undertaken, and, considering the factors mitigating against immediate sale, reasonable progress has been made toward the alienation of all corporate assets. Liquidating distributions to shareholders have been made in amounts exceeding annual net incomes. Thus, the traditional liquidating activities of payment of debts, sale of assets, and distribution of excess have all been undertaken. The ongoing business activities of Sunday Creek have in no way been inconsistent with the goal of corporate termination. Office operations have been reduced to a physical minimum in the converted house in Nelsonville, and staffing has been skeletal. Office and related equipment have been replaced as necessary, but have not been expanded or unreasonably retained. Coal mining, brokerage, machine shop, and other active operations in which Sunday Creek formerly engaged have been terminated. Home rental operations have been maintained only insofar as necessary to preserve assets, but systematic elimination of structures has been undertaken. Difficulties in selling encumbered acreage were correctly anticipated by the board of directors and were referred to in the *329 plan itself. Therefore, collection of royalties under oil and gas, mineral, and timber leases has continued. Leasing has functioned as a practical substitute for sales, and, under the described circumstances, we refuse to challenge the efficacy of this business practice.Continued leasing and royalty arrangements have been necessary to avoid the wasting of resources and to exploit assets for the shareholders' advantage. Such purposes are not at variance with a status of liquidation, and they are not prohibited activities of a liquidating business. See, e.g., Estate of Fearon v. Commissioner,supra. To the contrary, Sunday Creek has not engaged in oil and gas or mineral development, reforestation, the pursuit of ongoing business, or other active endeavor. The corporation has, instead, confined its activies to those which will inevitably lead to its termination. The direct connection between Sunday Creek's activities and eventual termination is not merely speculative. Concrete results of the corporation's policy are visible even in the earliest years of the liquidation process, those at issue in the instant case. Business activity has been curtailed to consist only *330 of the passive receipt of income.Actual contraction of corporate assets is apparent both in the reduction of owned and unleased acreage and in the depletion of net worth through the systematic distribution of liquidating dividends. Respondent argues that the lack of sharp contrast between the corporation's activities before and after adoption of the plan suggests that activities are not directed toward liquidation. However, there is no legal authority for the proposition that post-plan activities must dramatically differ from earlier activities. Rather, the requirement is only that current activities be evaluated in the context of the expressed goal of liquidation. In the instant case, it is true that leasing operations begun before adoption of the plan continued thereafter. It is also true that, even before 1973, a variety of steps were taken to contract the business of Sunday Creek. Active coal mining ceased at least by 1940, phasing out of the home rental business began as of 1969, a board of directors committed to liquidation was elected in 1970, the coal brokerage business was terminated in 1970, the machine shop at Corning was sold in 1970, and the moving of corporate facilities *331 to the reduced capacity of the house in Nelsonville occurred in 1970. These earlier steps may be explained by the operating problems which Sunday Creek experienced over the years, or they may support the possibility that the corporation entered a status of liquidation even before adoption of a formal plan. [26] In either case, these pre-1973 events do not prejudice our conclusion that post-1973 corporate activities were directed and confined to the purpose of liquidation. All prongs of the test for status of liquidation having been satisfied, we hold that Sunday Creek was in a status of liquidation at least since December 6, 1973. Therefore, distributions made by the corporation to its shareholders, including petitioners, during 1974 and 1975 were amounts distributed in complete liquidation of a corporation and are entitled to exchange treatment under section 331. We have considered respondent's other arguments and find them unpersuasive. To reflect the foregoing, Decision will be entered for the petitioners.
Footnotes
1. The further issue of the amount of medical expense deductions for each year has been resolved by stipulation of the parties. Depending on our decision in this case, automatic adjustment may be required to reflect any increases in amounts of adjusted gross income. However, no calculation under Rule 155 will be necessary. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The corporation involved herein was founded by the merger of three concerns--a predecessor New Jersey corporation also named Sunday Creek Coal Co.; the Ohio Land and Railway Co.; and the Buckeye Coal and Railway Co. (a wholly-owned subsidiary of the Hocking Valley Railway Co.).↩
4. The Preston Oil Co. was a predecessor of the Columbia Gas Transmission Co. ↩
5. The term of the lease has been interpreted by both parties thereto as extending for so long as oil and gas are being produced from the property. Therefore, the lease remained in effect up to and throughout the period at issue in this case.↩
6. One exception occurred during 1940 through 1945 when the corporation was a participant in a joint venture formed to operate one mine.↩
7. This operation began in 1945 as a repair shop. It was later turned into a full-scale machine shop which was operated in varying forms until its sale by the corporation in 1970.↩
8. John, Sallie, and Virginia were not the only shareholders of Sunday Creek at that time. However, their combined controlling interest exceeded 70 percent of all shares, and they were the only three shareholders to enter into the shareholders' agreement.↩
9. The parties were independent in that none was a shareholder of the corporation. The voting trustees and directors were: Sol Morton Isaac (the lawyer who had represented Sallie in the derivative shareholder suit), John L. Davies (who had represented Virginia), James P. Kennedy and Herbert R. Brown (both of whom had represented John), and Dr. John K. Pfahl (an impartial businessman representing the interests of all shareholders). Each trustee could be replaced only through written instructions of the shareholder he had represented in the litigation, except Dr. Pfahl, who could be replaced only by unanimous agreement of the remaining four trustees. The procedure for replacement of voting trustees was identical with that for directors. Sallie, Virginia, and John Could not be named as directors. We note that several resignations and replacements of officers and directors subsequently occurred, a circumstance which does not affect our opinion in the instand case. As used hereinafter, the terms "trustees", "officers", "directors", or "board" shall refer to whosoever held said positions as of the dates indicated in context. ↩
10. The trust agreement provided in pertinent part: "[Sallie and Virginia] and the Voting Trustees agree in principle that the affairs of [Sunday Creek] shall be conducted with a view toward a corporate liquidation, sale of assets, merger, exchange of shares or other winding up of the affairs of [Sunday Creek] as soon as the same may reasonably be accomplished; provided, however, that the details and procedures of accomplishing said purpose shall be left to the judgment of the directors of [Sunday Creek]."↩
11. In accordance with sec. 6043(a) and the applicable regulations thereunder, the minutes of this special shareholders' meeting were attached to the corporation's 1973 Federal income tax return, together with Form 966, entitled "Corporate Dissolution or Liquidation." ↩
12. The plan provided in pertinent part: "3. Sale of Assets.
After approval of the Plan by the shareholders, Sunday Creek shall not engage in any business activities except for the purposes of preserving the value of its assets, adjusting and winding up its business and affairs, selling all of its assets pursuant to the provisions of the Plan as soon as feasible, and making liquidating distributions of the cash available from the sale of its assets and from its other activities, as summarized in section 4 below, to its shareholders in order to achieve the redemption of their shares and the complete liquidation of Sunday Creek in accordance with the Plan. The directors and officers of Sunday Creek shall serve in their offices solely for these purposes. Upon approval of the Plan by the shareholders, Sunday Creek shall accomplish the complete liquidation by the sale of all of its assets of every description, real and personal. The Board of Directors shall, in its sole discretion, after first considering the reasonableness of the price and terms of a proposed sale of assets, determine whether or not to approve such sale and the terms thereof. The proposed terms and conditions of any such sale shall not be submitted to a vote of Sunday Creek's shareholders, and any agreement for such sale shall be final and binding on Sunday Creek when authorized and approved by the affirmative vote of a majority of the Board of Directors. The officers are hereby authorized and directed to enter into such agreements as may be approved from time to time by the Board of Directors for the sale of the assets of Sunday Creek." ↩
13. The plan further provided: "4. Cessation of Business.
The major sources of Sunday Creek's income in recent years have been royalty income from various coal leases, rental income from single family dwellings and mobile home sites, timber stumpage income from timber cutting operations conducted by others upon Sunday Creek lands, oil and gas royalties pursuant to long term leases and related activites. Sunday Creek has not for the past several years conducted mining operations or engaged in the active conduct of a trade or business, other than the abovementioned activities, nor may it do so under this Plan. However, the Board of Directors is authorized to enter into such royalty, stumpage, lease arrangements and related activities pending sale of assets as the Board of Directors may determine to be advisable and not inconsistent with the complete liquidation of Sunday Creek." ↩
14. The plan further provided: "5. Liquidating Distributions.
Sunday Creek shall make one or more liquidating distributions pro rata to or for the account of its shareholders. Such liquidating distributions shall include cash from the sale of Sunday Creek's assets and from any of its other activities described in section 4 above. The amount of those distributions, as determined by the Board of Directors, shall be reduced to provide for the payment of expenses and any amounts reasonably required to meet claims or contingencies. A liquidating distribution shall be made as soon as practicable after any sale of Sunday Creek's assets."↩
15. Of these approximately 36,800 total acres owned as of 1981, 20,000 acres were in fee and 16,800 acres were in mineral rights.↩
16. Income amounts from some sources actually increased in the years since adoption of the plan, e.g., oil and gas royalty income was $13,139.75 for 1970, $39,106.03 for 1974, and $620,409.32 for 1981. ↩
17. Rental income was generated by various houses and mobile home sites owned by Sunday Creek and originally used as mining camp residences. Beginning in 1969, the corporation initiated a policy of destroying units as they became vacant. As a result, the approximately 400 units owned as of 1960 were reduced to 200 units by 1970 and to 40 units by the time of trial.↩
18. Petitioners presumably received additional amounts during the other years in which Sunday Creek made liquidating distributions. However, only taxable years 1974 and 1975 are in issue in the instant case.↩
19. Dividends are defined in sec. 316, as referred to in sec. 301(c)(1), as distributions out of accoumulated or current earnings and profits. ↩
20. Sec. 301(c)(3)(B) provides a limited exception, not applicable here. Thereunder, to the extent that increase in value accrued before March 1, 1913, the capital gain portion of a distribution is exempt from tax. ↩
21. We note that sec. 331 was amended in 1982. However, the changes made therein are not effective for the taxable years here in issue and, in any event, are not relevant to resolution of the instant controversy.↩
22. As shown on the chart set forth earlier in this opinion, this pattern continued after the years in issue, with minor exceptions during 1978 and 1979. The total distributed from 1973 through 1981 exceeded the total net income for that entire period by more than $750,000.00.↩
23. Respondent acquiesced in this decision at 1951-2 C.B. 2↩.
24. As effective during the taxable year in issue in Howell, sec. 337 provided in relevant part: "(a) GENERAL RULE.--If (1) a corporation adopts a plan of liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period."↩
25. It is arguable that the requisite intent existed even before adoption of the plan in 1973, e.g., as of settlement of the lawsuit in 1970. On the other end of the process, our conclusions herein suggest that the status of liquidation continued beyond tax year 1975, e.g., up until the date of trial and thereafter. Resolution of the instant case, however, does not require us to determine specific starting and completion dates of the liquidation period.↩
26. See note 25, supra.↩